[Cite as *State v. Driggins*, 2012-Ohio-5287.]

# Court of Appeals of Ohio

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**No. 98073**

## STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

## RYAN DRIGGINS

DEFENDANT-APPELLANT

## JUDGMENT:
## AFFIRMED

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-493626

**BEFORE:** Sweeney, P.J., Cooney, J., and E. Gallagher, J.

**RELEASED AND JOURNALIZED:** November 15, 2012

**ATTORNEY FOR APPELLANT**

Paul Mancino, Jr.
75 Public Square
Suite 1016
Cleveland, Ohio   44113-2098

**ATTORNEYS FOR APPELLEE**

Timothy J. McGinty
Cuyahoga County Prosecutor
By:   Mark J. Mahoney
Assistant County Prosecutor
Ninth Floor, Justice Center
1200 Ontario Street
Cleveland, Ohio   44113

JAMES J. SWEENEY, P.J.:

{¶1} Defendant-appellant Ryan Driggins ("defendant") appeals his convictions for murder, aggravated robbery, and aggravated burglary, and his accompanying sentence of life in prison with the possibility of parole after 38 years. After reviewing the facts of the case and pertinent law, we affirm.

{¶2} On February 28, 2007, defendant was involved in the shooting of Glenn Rankin during the burglary and robbery of Rankin's house. On March 5, 2007, defendant was arrested and he gave a statement to police admitting to being in a car with the men who commited the offenses, but claiming no knowledge of, or involvement in, the crimes.

{¶3} On March 6, 2007, defendant told police that he shot Rankin and that his previous statement was a lie.

{¶4} On March 7, 2007, defendant called his former high school football coach, Theodore Ginn, Sr., and asked for help with a "situation that went bad." On March 14, 2007, defendant spoke with Ginn face-to-face and made a written statement to police, confessing to robbing Rankin's house and claiming that, when Rankin tried to grab the gun from him, defendant pulled the trigger.

{¶5} On March 15, 2007, defendant was indicted for two counts of aggravated murder, two counts of aggravated robbery, and two counts of aggravated burglary, all with three-year firearm specifications. On August 9, 2007, defendant pled guilty to

murder with a firearm specification and aggravated robbery. As part of this plea bargain, defendant agreed to testify against Dionte Ricks, who defendant alleged went into Rankin's house with him. On August 13, 2007, the court sentenced defendant to life in prison with the possibility of parole after 18 years.

{¶6} In June 2008, defendant refused to testify at Ricks's trial, and the State filed a motion to vacate defendant's guilty plea, which the court granted. On June 15, 2009, the court denied defendant's motion to suppress the oral and written statements he made to the police in March 2007.

{¶7} The case went to trial before a jury, and on August 21, 2009, defendant was found guilty of the following:

·	murder in violation of R.C. 2903.02(A), as a lesser included offense of aggravated murder

·	felony murder in violation of R.C. 2903.02(B), as a lesser included offense of aggravated murder

·	aggravated robbery in violation of R.C. 2911.01(A)(1)

·	aggravated robbery in violation of R.C. 2911.01(A)(3)

·	aggravated burglary in violation of R.C. 2911.11(A)(1)

·	aggravated burglary in violation of R.C. 2911.11(A)(2)

·	three-year firearm specifications in violation of R.C. 2941.145

{¶8} On August 24, 2009, the court sentenced defendant to life in prison with the possibility of parole after 38 years. The details of defendant's sentence follow:

·     life in prison with the possibility of parole after 15 years for the murder convictions, which merged for sentencing

·     ten years in prison for the aggravated robbery convictions, which merged for sentencing

·     ten years in prison for the aggravated burglary convictions, which merged for sentencing

·     three years in prison for the firearm specifications, which merged for sentencing

·     the court ran all sentences consecutively

**{¶9}** Defendant appealed, however, his case was dismissed on May 21, 2010, for lack of a final appealable order.   On February 13, 2012, the trial court issued a corrected sentencing journal entry, which disposed of the indicted offenses of aggravated murder pursuant to *State v. Baker*, 119 Ohio St.3d 197, 2008-Ohio-3330, 893 N.E.2d 163.

**{¶10}** Defendant appeals and raises 22 assignments of error for our review.

<u>Motion to Suppress</u>

**{¶11}**   In defendant's first, second, third, fourth, and 20th assignments of error, he challenges the court's denial of his motion to suppress the oral and written statements he made to the police on March 5 and March 14, 2007.

I.

Defendant was denied due process of law when the court overruled the motion to suppress as defendant had not knowingly, intelligently and voluntarily waived his *Miranda* rights.

II.

Defendant was denied due process of law when the police employed a private individual to induce defendant to make his statement.

## III.

Defendant was denied due process of law and his Sixth Amendment right to counsel when he was interviewed by the police after he appeared for a preliminary hearing and had counsel.

## IV.

Defendant was denied due process of law when the court overruled his motion to suppress resulting from an illegal and unconstitutional arrest.

## XX.

Defendant was denied due process of law when the court failed to make findings of fact and conclusions of law.

> Appellate review of a trial court's ruling on a motion to suppress presents mixed questions of law and fact. An appellate court is to accept the trial court's factual findings unless they are clearly erroneous. We are, therefore, required to accept the factual determinations of a trial court if they are supported by competent and credible evidence. The application of the law to those facts, however, is subject to de novo review.

(Citations omitted.)  *State v. Polk*, 8th Dist. No. 84361, 2005-Ohio-774, ¶ 2.

**{¶12}** The following evidence was presented at defendant's suppression hearing: Cleveland Police Detective Joselito Sandoval and Cuyahoga County Sheriff Detective John Morgan testified that defendant was a "person of interest" in Rankin's homicide investigation. On March 5, 2007, the detectives saw defendant walking near East 129th Street and Lakeview Road, approached him, and asked him his name. Defendant appeared "shifty-eyed" and nervous, and responded that his name was "Mike," which the police knew was not true. Defendant then "took off running" and threw a bag of

crack-cocaine over a fence. The police caught up with defendant and arrested him for a drug offense.

{¶13} Det. Sandoval and Det. Morgan read defendant his *Miranda* rights, and defendant was willing to talk with the police without an attorney. The detectives took defendant to the homicide unit and "advised him that the narcotics were not our main issue of speaking with him, but yet it was a murder that occurred." Defendant again waived his *Miranda* rights, this time in writing. At the top of the waiver form, which was admitted into evidence at the suppression hearing, the subject reads "aggravated murder."

{¶14} Defendant made an oral and a written statement to the police, in which he claimed to have been in the car with the people who committed the crime. Defendant told the police that he had no knowledge of what was going to happen and gave the police two names in connection with the murder. After his statement, defendant was booked for violation of a state drug law.

{¶15} On March 6, 2007, the police spoke with Antonio Hasberry and Terrell Dillard, who were in the car with defendant and Ricks when Rankin was killed. Both men contradicted defendant's version of the events. At that time, defendant became the main suspect in the homicide. According to Det. Sandoval, later that day defendant told the police that "he needed to confess on this crime because he didn't want anybody else to get in trouble for what he did, that it was all his planning, and he committed the crime."

{¶16} Det. Morgan read defendant his *Miranda* rights, and defendant waived them. Defendant confessed to the robbery and shooting, but told the police that he was not sure if he wanted to put it in writing. According to Det. Sandoval, he and Det. Morgan "advised [defendant] to talk to an attorney or somebody else that * * * he has faith in * * * to advise him what he should do. Because * * * it's a major deal. Which he said he would. And at that point basically we were done * * * with the interview and we had him return to the jail area."

{¶17} The next day, March 7, 2007, defendant was given access to a phone and he called Ginn. According to Det. Sandoval, defendant told the police Ginn "was looking into trying to find an attorney for him."

{¶18} On March 14, 2007, Det. Morgan went to see Ginn at Glenville High School. Det. Morgan told Ginn that Ginn may be a witness in the case because defendant called him. Ginn requested to speak with defendant. The following colloquy took place during Det. Morgan's testimony:

> Q: Out of this conversation at any time did you request Mr. Ginn to go speak with [defendant]?
>
> A: No, I did not.
>
> Q: Who requested to speak with [defendant]?
>
> A: Mr. Ginn.
>
> Q: And did you at any time ask him to get [defendant] to make a written statement?
>
> A: No.

{¶19}   That same day, Ginn followed Det. Morgan to the homicide office where arrangements had been made for Ginn to speak with defendant.   Det. Morgan testified that he spoke with Ginn as they waited for defendant to arrive:

> Q: During that conversation in any way did you suggest or ask Mr. Ginn to do something for you or [the] State of Ohio?
>
> A: No.
>
> Q: Did you ever ask him to act as an agent of the State of Ohio?
>
> A: No.
>
> Q: Did you ever ask him to force [defendant] to make a statement?
>
> A: No.

{¶20} Ginn and defendant had a private conversation, after which, according to Det. Morgan, defendant was ready to make a written statement.   Defendant was again *Mirandized*, and he again waived his rights.   Shortly after defendant started talking, Ginn left.

{¶21} Ginn testified that he was a "mentor" and "father-figure" to defendant. Defendant called Ginn from jail "after the incident," asking for help with "[t]he situation that went bad."   Ginn said to defendant, "I'll talk to you later.   We'll see what we can do."   According to Ginn, the word "lawyer" or "attorney" did not come up in the conversation.

{¶22}   Subsequently, Det. Morgan came to Ginn's office and asked Ginn if he had spoken with defendant.   Ginn replied, "[Y]es * * * I just need to see what I can do

to help." Ginn testified that the police officers did not ask him to elicit a statement or confession from defendant. Ginn further testified as follows:

Q: Did [at] any time [Det.] Morgan ask you to do something for him?
A: Not for him.

Q: Did you want to do something for anybody?

A: I wanted to do something for [defendant].

Q: Were you able to speak with [defendant]?

A: Yes.

{¶23} Ginn told Det. Morgan that he wanted to meet with defendant. Ginn went downtown, met with defendant, and told him, "Just tell whatever went down and be done with it. And we'll go from there." According to Ginn, he and defendant "made a decision to do the statement." Asked if he forced defendant to make a statement, Ginn testified as follows:

No, I wouldn't say I forced him. I thought we sat down and talked and agreed to what was right in his eyesight, what I feel is right, you know, it was basically whatever the decision did he want to make. Because I just feel he was frustrated and he knew more about it than I did.

* * * [Defendant] called me because he was tired. He was — he wanted to make it right. That's how I got involved with this statement. * * * He leaned on me to do that. So as a father figure, anybody trying to help your child, you know, he know more about it than I do. The way I got down here was following the lead of [defendant]. And as a father, as a mentor or anything like that, you know, I believe in right.

{¶24} During Ginn's cross-examination, the following colloquy took place:

Q: But what did the detective want you to do about [defendant] being in jail? What did he want you to do? He's in jail. So what?

A: He didn't want me to do anything.

Q: Sir, didn't Detective Morgan want you to meet with [defendant] to assist [him] or to convince [him] to make a statement in this case? That's why he met with you; isn't that true?

A: I'm going to be honest with you. I really don't believe that. You know when he came to me I had talked to [defendant]. And I knew that it was an incident and when Detective Morgan came by I knew why he was there. So I didn't — he didn't ask me to do anything. I probably asked him, what could I do to help * * * [defendant]. And he never really gave me any advice. I probably was the one that was pursuing more than anybody. And I — and I just wanted * * * to help [defendant] out. But I couldn't say that anybody asked me to do anything.

{¶25} Ginn testified that he "couldn't sit there and take" listening to defendant's statement, so he left.

{¶26} Defendant testified that his March 5, 2007 statement to the police was a lie, which is consistent with the detectives' testimony. However, according to defendant, the police did not give him a *Miranda* warning at his March 5, 2007 arrest. Additionally, on March 6, 2007, he was not read his *Miranda* rights, and he did not give an oral statement to the police admitting anything. He requested a lawyer from the police, and he said, "I don't want to come write no more statements. I want a lawyer. As a matter of fact, I didn't have my phone call." Defendant alleged that he called Ginn the same day and asked Ginn to get him a lawyer. Ginn replied that "he would see what he can do." Additionally, defendant testified that the fact that the police "backed off from the 6th to the 14th" shows that he asked for a lawyer.

**{¶27}** According to defendant, nothing happened on March 7, 2007. Defendant testified that "a couple of days later," he met with Ginn and a detective named "Joe." Defendant refused to testify about the subject of the meeting. Defendant met with Ginn again on March 14, 2007. Defendant testified that the statement he made to the police was not voluntary; rather, he made a statement that day "because I was scared that I was going to get the death penalty if I didn't." Specifically, defendant testified that Ginn "told me that I needed to take the needle out of my arm. His exact words." According to defendant, he would not have made the statement if the detectives and Ginn did not "threaten" him with the death penalty.

**{¶28}** Defendant further testified that, although he initialled the *Miranda* warning section of his March 14, 2007 written statement, Det. Morgan never read him his rights and defendant never waived them. According to defendant, he did not "bother reading" the written statement before signing it, and it is not true.

**{¶29}** We turn to defendant's argument on appeal that his motion to suppress the evidence against him should have been granted because his February 27, 2007 arrest was "illegal and unconstitutional," as he "had committed no offense" at the time.

**{¶30}** Warrantless searches are presumptively unconstitutional, subject to a limited number of specific exceptions. One exception to the rule requiring warrants is found in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), which stands for the proposition that "a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibl[e] criminal

behavior * * *." *Id.* at 22. To warrant a *Terry* investigatory stop, the police "must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Id.* at 21. The Ohio Supreme Court stated that an investigatory stop "must be viewed in light of the totality of the surrounding circumstances." *State v. Freeman*, 64 Ohio St.2d 291, 414 N.E.2d 1044 (1980).

{¶31} In *State v. White*, 8th Dist. No. 93109, 2010-Ohio-521, this court affirmed the trial court's denial of a motion to suppress when the defendant, upon seeing the police, attempted to hide something by throwing it on the ground in a high drug area. *See also State v. Williams*, 8th Dist. No. 63502, 1993 Ohio App. LEXIS 4237 (Sept. 2, 1993) (police were justified in stopping the defendant, who "dropped the bag [of cocaine] to the ground and ran from the police. He no longer had any expectation of privacy in the bag at that point").

{¶32} In the instant case, defendant testified that he said his name was "Mike" and ran away after being approached by the police officers, because he had a bag of crack-cocaine. Pursuant to R.C. 2925.11(C)(4), possession of cocaine is a felony, which is an arrestable offense.

{¶33} Accordingly, defendant's fourth assignment of error is overruled.

{¶34} Defendant's next argument related to his motion to suppress is that the court failed to issue findings of fact and conclusions of law. However, upon review, we find that on June 16, 2009, the court went on the record to explain its reasoning behind denying defendant's motion to suppress. The court found that defendant's confession

was voluntary, that Ginn was not acting as an agent of the state of Ohio, that defendant initiated the contact with Ginn, that defendant "was read and explained his *Miranda* warnings on more than one occasion by both detectives," that defendant signed multiple waivers of his *Miranda* rights, and that defendant testified at the suppression hearing that he had not been coerced in any way.

{¶35} Pursuant to Crim.R. 12(F), "[w]here factual issues are involved in determining a motion, the court shall state its essential findings on the record." This court has found that "a trial court's statements on the record [are] sufficient to meet the requirements of Crim.R. 12(F)" if they are detailed and precise enough to provide a meaningful basis for appellate review. *State v. Alhajjeh*, 8th Dist. No. 93077, 2010-Ohio-3179, ¶ 27.

{¶36} Because the court stated its findings of fact and conclusions of law on the record, defendant's 20th assignment of error is overruled.

{¶37} Defendant next argues that "[t]he continued interrogation of defendant, after telling defendant about obtaining counsel, violated defendant's Fifth Amendment constitutional right." In *State v. Henricksen*, 8th Dist. No. 51496, 1987 Ohio App. LEXIS 7160 (Feb. 19, 1987), this court held the following:

> *Miranda v. Arizona* (1966), 384 U.S. 436 requires that prior to a custodial interrogation, the accused must be apprised of his or her right against self-incrimination and right to counsel. Any statements made by the accused must be the result of a voluntary, knowing, and intelligent waiver of the right to remain silent. *Miranda*, supra. A waiver of such rights may be inferred from the totality of the circumstances. *North Carolina v. Butler* (1979), 441 U.S. 369.

**{¶38}** When a suspect invokes his or her *Miranda* right to counsel, police interrogation must stop. The request for counsel must be unambiguous.

> As we have observed, "a statement either is such an assertion of the right to counsel or it is not." * * * Although a suspect need not "speak with the discrimination of an Oxford don," * * * he must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney. If the statement fails to meet the requisite level of clarity, [the law] does not require that the officers stop questioning the suspect.

*Davis v. U.S.*, 512 U.S. 452, 459, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994).

**{¶39}** In the instant case, the court found that defendant waived his *Miranda* rights multiple times. This is supported by two written *Miranda* waivers, memorialized as part of defendant's March 5 and March 14, 2007 written statements, as well as Det. Sandoval's and Det. Morgan's testimony. "At a suppression hearing, the evaluation of evidence and the credibility of witnesses are issues for the trier of fact." *State v. Mills*, 62 Ohio St.3d 357, 366, 582 N.E.2d 972 (1992). Because we are to accept the trial court's factual findings if they are supported by competent, credible evidence in the record, defendant's first assignment of error is overruled.

**{¶40}** Defendant next argues that Ginn acted on behalf of the authorities and induced defendant to confess to the crimes.

**{¶41}** In *State v. Daily*, 53 Ohio St.3d 88, 91–92, 559 N.E.2d 459 (1990), the Ohio Supreme Court, held the following:

> A suspect's decision to waive his Fifth Amendment privilege is made voluntarily absent evidence that his will was overborne and his capacity for self-determination was critically impaired because of coercive police conduct. * * * Thus, coercive police activity is a necessary predicate

to finding that a confession is not voluntary within the Fifth Amendment, on which *Miranda* was based.

**{¶42}** In the instant case, Ginn and both detectives testified that the authorities did not ask Ginn to do anything related to this case. Defendant called Ginn, and Ginn decided to meet with defendant face-to-face, and they agreed that defendant would make a statement. Because there is no evidence of coercion, defendant's second assignment of error is overruled.

**{¶43}** Defendant's final argument regarding his motion to suppress is that his Sixth Amendment right to counsel was violated when the police interviewed him after judicial proceedings had been initiated. However, according to the record, defendant made statements to the police on March 5 and March 14, 2007, and he was indicted in this case on March 15, 2007. "The Sixth Amendment right to counsel attaches only at the initiation of adversary criminal proceedings * * *, and before proceedings are initiated a suspect in a criminal investigation has no constitutional right to the assistance of counsel." *Davis v. U.S.*, 512 U.S. 452, 456, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994).

**{¶44}** Accordingly, defendant's Sixth Amendment right to counsel was not violated and his third assignment of error is overruled.

Plea Bargain

**{¶45}** Defendant's 21st assignment of error states as follows:

XXI.

Defendant was denied due process of law and placed twice in jeopardy when the court vacated his original sentence on motion of the prosecutor.

**{¶46}** Specifically, defendant argues that "[t]he court did not inquire of defendant *personally* whether he understood his plea could be vacated if he did not testify or refused to testify. Thus the vacation of the plea and sentence by a different judge at a later date placed defendant twice in jeopardy by his later trial." (Emphasis in original.)

**{¶47}** In *State v. Clark*, 119 Ohio St.3d 239, 2008-Ohio-3748, 893 N.E.2d 462, ¶ 27, the Ohio Supreme Court held the following:

> Under [Crim.R. 11(C)], the trial judge may not accept a plea of guilty or no contest without addressing the defendant personally and (1) "[d]etermining that the defendant is making the plea voluntarily, with understanding of the nature of the charges and of the maximum penalty involved, and, if applicable, that the defendant is not eligible for probation or for the imposition of community control sanctions at the sentencing hearing," (2) informing the defendant of the effect of the specific plea and that the court may proceed with judgment and sentencing after accepting it, and ensuring that the defendant understands these facts, and (3) informing the defendant that entering a plea of guilty or no contest waives the constitutional rights to a jury trial, to confrontation, to compulsory process, and to the requirement of proof of guilt beyond a reasonable doubt and determining that the defendant understands that fact. *Id*. at (C)(2)(a) through (c).

**{¶48}** Upon review, we find that the court complied with Crim.R.11(C) in accepting defendant's guilty plea. There is no requirement that the court ask a defendant if he or she understands that the plea could be vacated if breached. Furthermore, the State, in explaining the terms of the plea agreement on the record, stated the following: "And in addition, as part of this plea, your Honor, it's the State's understanding that the Defendant will testify truthfully on behalf of the State of Ohio as a State witness in any proceeding that may be brought involving the potential Co-Defendants."

**{¶49}** Defendant's 21st assignment of error is overruled.

Public Trial

{¶50} In defendant's fifth assignment of error, he argues as follows:

V.

Defendant was denied his constitutional right to a public trial when the court closed the courtroom during portions of the testimony.

{¶51} Specifically, defendant argues that the court erred when it "excluded the public from the courtroom" after "unknown individuals were harassing or bothering potential state witnesses."

{¶52} "The right to a public trial is a fundamental constitutional guarantee under the Sixth Amendment to the United States Constitution and Section 10, Article I of the Ohio Constitution." *State v. Drummond*, 111 Ohio St.3d 14, 2006-Ohio-5084, 854 N.E.2d 1038, ¶ 49. However, this right is not absolute, and a trial judge has the authority and discretion to control courtroom proceedings. *Id.* at ¶ 51. We review a trial court's removal of a person from the courtroom under an abuse of discretion standard. *State v. Brown,* 8th Dist. No. 73060, 1998 Ohio App. LEXIS 5589 (Nov. 25, 1998).

{¶53} In *Waller v. Georgia*, 467 U.S. 39, 48, 104 S.Ct. 2210, 81 L.Ed.2d 31 (1984), the United States Supreme Court set forth a four-part test to determine whether courtroom closure is necessary:

[T]he party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced, the closure must be no broader than necessary to protect that interest, the trial court must consider reasonable alternatives to closing the proceeding, and it must make findings adequate to support the closure.

**{¶54}** Our review of the transcript in the instant case shows that during trial, the court removed four individuals who were seated in the back of the courtroom after the prosecutor overheard them intimidating Terrell Dillard, who testified for the State. The court stated that it "cannot have witnesses intimidated as they are presented to come up to testify," and that the "defendant's rights are too important * * * at this time for there to be any disruption in the courtroom." The court further stated that it was "closing the courtroom to you [four people] and just to you."

**{¶55}** We find that the court acted within its discretion when it removed from the courtroom four individuals who were intimidating a witness. Defendant's fifth assignment of error is overruled.

<u>Other Acts Evidence</u>

**{¶56}** In defendant's sixth and seventh assignments of error, he argues as follows:

VI.

Defendant was denied a fair trial when the court allowed evidence of other bad acts and failed to give any limiting instruction.

VII.

Defendant was denied due process of law when the court allowed evidence of defendant's arrest for an unrelated drug law violation.

**{¶57}** Specifically, defendant argues that it was error for the court to allow evidence of a prior "unrelated" burglary of a house located near Rankin's, during which defendant stole approximately $80,000 hidden in a heating vent. Defendant also argues

that it was error for the court to allow evidence of his "irrelevant" March 5, 2007 arrest for drugs.

**{¶58}** Generally, evidence of other crimes committed by a defendant is inadmissible to prove that the defendant committed the offense in question. However, R.C. 2945.59 states that "[i]n any criminal case in which the defendant's motive * * *, intent, * * * absence of mistake or accident * * *, scheme, plan, or system in doing an act is material," other acts that tend to prove these things are admissible into evidence. Additionally, Evid.R. 404(B) states that

> [e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

**{¶59}** We review the admission of evidence under an abuse of discretion standard. *State v. Maurer*, 15 Ohio St. 3d 239, 473 N.E.2d 768 (1984). "The term 'abuse of discretion' connotes more than an error of law or of judgment; it implies that the court's attitude is unreasonable, arbitrary, or unconscionable." *State v. Adams*, 62 Ohio St.2d 151, 157, 404 N.E.2d 144 (1980). Additionally, the Ohio Supreme Court has held that "R.C. 2945.59 and Evid.R. 404(B) codify the common law with respect to evidence of other acts of wrongdoing, and are construed against admissibility." *State v. Lowe*, 69 Ohio St.3d 527, 530, 634 N.E.2d 616 (1994).

**{¶60}** In the instant case, the State argues that Dillard's testimony about defendant's prior burglary is admissible to show defendant's motive, plan, knowledge, and intent regarding the burglary at Rankin's house.

**{¶61}** According to Dillard, defendant originally told his friends he needed to stop at a house to look at a car that was for sale. When defendant got back into the car with Dillard, defendant said that "it got a little ugly inside of the house and he had to pop somebody." Dillard testified that defendant "told me that he had went in, and I guess it was some type of job he had did before or whatnot, and he was looking for some money, obviously, or whatever. It wasn't about a car anymore." According to Dillard, defendant was looking for money in the heating vent of Rankin's house.

**{¶62}** Dillard also testified that approximately one year earlier defendant "climbed through somebody's window or something while they were on vacation and searched the house and found some money in a vent."

**{¶63}** This evidence is corroborated by defendant's March 14, 2007 written statement, in which he describes in detail a robbery he and two men committed in March 2006 at 12608 St. John Ave. in Cleveland. According to defendant's confession the two men were tipped off that the owners of the house kept a large amount of cash "in a blue bag wrapped in aluminum foil" hidden in the "floor vent in a bedroom." The men entered the house through a back window and stole approximately $92,000.

**{¶64}** In this same written statement, defendant told the police that on February 27, 2007, he went to Rankin's house, which is located at 12716 St. John Ave.,

under the guise of inquiring about a car for sale. With gun in hand, defendant asked Rankin where the money was. A struggle ensued, and defendant pulled the trigger, shooting Rankin. Defendant asked Rankin again where the money was, and Rankin replied that he had money in his wallet. Defendant said, "I have been here before and I got 80 Thousand." Defendant searched the bedroom vents but found nothing.

{¶65} One of the factors used to determine admissibility of other acts evidence is whether

> a connection, in the mind of the defendant, must have existed between the offense in question and the other acts of a similar nature. * * * The other acts of the defendant must have such a temporal, modal and situational relationship with the acts constituting the crime charged that evidence of the other acts discloses purposeful action in the commission of the offense in question. The evidence is then admissible to the extent it may be relevant in showing the defendant acted in the absence of mistake or accident.

*State v. Burson*, 38 Ohio St.2d 157, 159, 311 N.E.2d 526 (1974). *See also State v. Sandifer*, 8th Dist. No. 60761, 1992 Ohio App. LEXIS 2853 (June 4, 1992) (evidence "that appellant had previously attempted to take money from an individual during a routine traffic stop * * * tended to show a scheme or plan which was relevant to the crime charged").

{¶66} Accordingly, it was not error for the court to allow evidence that tended to show defendant robbed Rankin's house because he thought it was the same house he robbed on a prior occasion. Defendant's sixth assignment of error is overruled.

{¶67} Turning to defendant's March 5, 2007 arrest, the court found the following evidence admissible: "that [defendant] was approached, that he gave incorrect identifying

information, that he threw something down, that he was arrested for violation of State drug law * * *." The court found that the evidence was relevant because it explained to the jury how defendant was in police custody when he made a statement about the homicide. Further the court found that the evidence was not "overwhelmingly prejudicial, when [defendant] himself admits to having the drugs and throwing them."

{¶68} During trial, defendant offered to stipulate that he was arrested. However, the court found that this was "not a classic case of other acts. * * * And it is not like part of a completely separate chain of events. From my perspective, it is evidence, it shows a continuum of how this began, how [defendant] was taken into custody. * * * [T]he circumstances of his arrest are absolutely part of how this case even began."

{¶69} The court further found that

the State of Ohio is entitled to show and explain to this jury why the defendant was arrested, because if they are not able to do that, then there is a gaping hole in which you could argue that the State singled out this man for questioning and that they abused their power in this particular case. I believe that the fact that the defendant was arrested and gave a false name, and he was arrested validly and with probable cause, is something that the jury is entitled to understand.

{¶70} The court gave a limiting instruction to the jury when Det. Morgan testified about defendant's arrest:

The evidence of the defendant's arrest is to show you why the officers acted in the way they did. It is not to be considered for any other purpose. * * * It is only to show you why the officers and why the detectives acted in the way that they did.

{¶71} Upon review, we find that, while defendant's lawful arrest is certainly relevant to the case at hand, the events leading up to that arrest are inadmissible other acts

evidence. In light of defendant's proposed stipulation to his arrest, testimony that he violated drug laws should have been kept out. However, the evidence supporting defendant's convictions is overwhelming. Specifically, defendant's confession to shooting Rankin during a "robbery gone bad" was properly admitted into evidence. Therefore, we find any error associated with the improperly admitted drug evidence harmless. As such, defendant's seventh assignment of error is overruled.

Jury Instructions

{¶72} Defendant's eighth, ninth, tenth, 11th, and 12th assignments of error challenge the court's jury instructions.

VIII.

Defendant was denied due process of law when the court failed to give an accomplice instruction with reference to Terrell X. Dillard.

IX.

Defendant was denied due process of law when he was sentenced to life imprisonment when all the elements of murder were not included in the jury instructions.

X.

Defendant was denied due process of law when the court allowed the defendant to be convicted of murder as a result of an intervening act.

XI.

Defendant was denied due process of law when the court failed to include all elements of murder under §2903.02(B) of the Ohio Revised Code.

XII.

Defendant was denied due process of law when defendant was allowed to be convicted for an offense for which no culpable mental state was required.

**{¶73}** With respect to jury instructions, a trial court is required to provide the jury a plain, distinct, and unambiguous statement of the law applicable to the evidence presented by the parties to the trier of fact. *Marshall v. Gibson*, 19 Ohio St.3d 10, 12, 482 N.E.2d 583 (1985). "However, the trial court need not give the defendant's requested instructions verbatim but may use its own language to communicate the same legal principles to the jury." *State v. Group*, 98 Ohio St.3d 248, 2002-Ohio-7247, 781 N.E.2d 980, ¶ 108. We review the refusal to give a jury instruction for an abuse of discretion. *Baker v. Cleveland*, 8th Dist. No. 93952, 2010-Ohio-5588, ¶ 28.

**{¶74}** Defendant first argues that it was error for the court not to give the jury "the mandated accomplice instruction" under R.C. 2923.01(H)(2) regarding Dillard's testimony. R.C. 2923.01 governs the offense of conspiracy. Defendant was not charged with, nor was he convicted of, conspiracy; therefore, this statute is irrelevant to the case at hand.

**{¶75}** R.C. 2923.03 governs the offense of complicity, and subsection (D) states that the court shall include an accomplice jury instruction "[i]f an alleged accomplice of the defendant testifies against the defendant in a case in which the defendant is charged with complicity in the commission of * * * an offense * * *." In the instant case, defendant was not charged with, nor was he convicted of, complicity. Further, there was

no allegation that Dillard was defendant's accomplice. *See State v. Fink*, 12th Dist. No. CA92-01-001, 1992 Ohio App. LEXIS 6453 (Dec. 21, 1992) ("because McNeal and McLaughlin were not appellant's co-conspirators or accomplices, and because public policy does not mandate a cautionary jury instruction in the typical unilateral conspiracy, we find that the instruction contained in R.C. 2923.01(H)(2) was not required in this case").

{¶76} Accordingly, as no evidence of conspiracy or complicity was presented to the jury, the court was not required to instruct on either theory of law. Defendant's eighth assignment of error is overruled.

{¶77} Defendant next argues that the jury instructions for the lesser included offense of felony murder in violation of R.C. 2903.02(B) failed to include the culpable mental state of recklessness.

> R.C. 2903.02(B), the felony-murder statute, does not contain a mens rea component. *See State v. Miller*, 96 Ohio St.3d 384, 2002-Ohio-4931, 775 N.E.2d 498, ¶ 31-33 (defendant may be found guilty of felony murder even if there was no intent to cause the victim's death). Rather, a person commits felony murder pursuant to R.C. 2903.02(B) by proximately causing another's death while possessing the mens rea element set forth in the underlying felony offense. In other words, the predicate offense contains the mens rea element for felony murder. *See State v. Sandoval*, 9th Dist. No. 07CA009276, 2008-Ohio-4402, ¶ 21.

*State v. Fry*, 125 Ohio St.3d 163, 2010-Ohio-1017, 926 N.E.2d 1239, ¶ 43.

{¶78} In the instant case, regarding aggravated burglary in violation of R.C. 2911.11(A)(1), the court instructed the jury that it must find that defendant "did by force, stealth or deception trespass in an occupied structure * * * with the purpose to commit

therein any criminal offense, and inflicted * * * physical harm on Glenn Rankin." In *Fry*, the Ohio Supreme Court determined that the culpable mental state for aggravated burglary, which is "purposeful," served as a proper predicate offense mens rea for felony murder. *Fry* at ¶ 44.

**{¶79}** Given that, in the case at hand, the court's jury instruction for aggravated burglary was proper, defendant's ninth and 12th assignments of error are overruled.

**{¶80}** Defendant next argues that the court instructed the jury improperly regarding the definition of "cause" under the lesser included offense of murder in violation of R.C. 2903.02(A), which states as follows: "No person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree * * *."

**{¶81}** In the instant case, the court gave the following jury instruction regarding the definition of the word "cause":

> Cause is an ability or failure to act which, in a natural and continuous sequence, directly produces death to Glenn Rankin and without which it would not have occurred.

> The defendant's responsibility is not limited to the immediate or most obvious result of the defendant's act or failure to act, ladies and gentlemen. The defendant is also responsible for the natural and foreseeable consequences or the results that follow in the ordinary course of events from the act or failure to act.

> There may be one or more causes of an event; however, if the defendant's act or failure to act was one cause, then the existence of another cause is not a defense.

> The defendant is responsible for the natural consequences of the defendant's unlawful act or failure to act even though the death to Glenn

Rankin was also caused by an intervening act, for example, or failure to act of another person or agency.

**{¶82}** Defendant argues that, according to this jury instruction, he "could be convicted even if the jury determined that the act was caused by another person." In *State v. Hanna*, 95 Ohio St.3d 285, 2002-Ohio-2221, 767 N.E.2d 678, ¶ 50, the Ohio Supreme Court concluded that 4 *Ohio Jury Instructions*, Section 409.56, which defines "intervening causes" was an adequate jury instruction. That jury instruction reads: "Intervening causes. The defendant is responsible for the natural consequences of the defendant's unlawful act, even though death was also caused by the intervening act of another person or agency." *Hanna* at ¶ 47.

**{¶83}** The jury instruction at issue substantively mirrors the jury instruction approved in *Hanna*. Defendant's tenth assignment of error is overruled.

**{¶84}** Defendant next argues that the jury instruction for the lesser included offense of felony murder in violation of R.C. 2903.02(B) failed to include that the jury had to unanimously agree on which set of facts defendant's guilty verdict was based, i.e., whether the predicate offense was aggravated robbery or aggravated burglary.

**{¶85}** In *State v. Davis*, 76 Ohio St.3d 107, 118-119, 666 N.E.2d 1099 (1996), the Ohio Supreme Court held that "[b]ecause the jury made a separate, unanimous finding of guilt as to each of the predicate felonies" of kidnapping and aggravated robbery, it was not plain error for the felony-murder instructions to omit an additional unanimous determination of which underlying felony had been committed.

**{¶86}** In following *Davis*, we find no error in the court's jury instruction, and defendant's 11th assignment of error is overruled.

Lesser Included Offenses

XIII.

Defendant was denied due process of law when the court instructed on murder which was not a lesser included offense of aggravated murder.

**{¶87}** In *State v. Reed*, 65 Ohio St.2d 117, 124, 418 N.E.2d 1359 (1981), the Ohio Supreme Court held that murder is a lesser included offense of aggravated murder. Defendant's 13th assignment of error is overruled.

XIV.

Defendant was denied due process of law and his right to present a defense when the court would not instruct on lesser included offenses.

**{¶88}** Specifically, defendant argues that it was error for the court to not instruct the jury on negligent homicide and involuntary manslaughter as lesser included offenses of aggravated murder.

> [I]n determining whether an offense is a lesser included offense of another, a court shall consider whether one offense carries a greater penalty than the other, whether some element of the greater offense is not required to prove commission of the lesser offense, and whether the greater offense as statutorily defined cannot be committed without the lesser offense as statutorily defined also being committed.

*State v. Evans*, 122 Ohio St.3d 381, 2009-Ohio-2974, 911 N.E.2d 889, ¶ 26, clarifying *State v. Deem*, 40 Ohio St.3d 205, 533 N.E.2d 294 (1988).

**{¶89}** Negligent homicide is not a lesser included offense of aggravated murder. *State v. Johnson*, 8th Dist. No. 53732, 1988 Ohio App. LEXIS 1864, (May 12, 1988).

On the other hand, "[i]nvoluntary manslaughter is always and necessarily a lesser included offense of murder because murder cannot ever be committed without also committing or attempting to commit a felony or a misdemeanor." *State v. Kidder*, 32 Ohio St.3d 279, 282, 513 N.E.2d 311 (1987).

**{¶90}** R.C. 2903.04(A) defines involuntary manslaughter as follows: "No person shall cause the death of another * * * as a proximate result of the offender's committing * * * a felony." The culpable mental state for involuntary manslaughter is the culpable mental state for the underlying felony. *State v. Ziko*, 71 Ohio App.3d 832, 535 N.E.2d 1019 (8th Dist.1991).

**{¶91}** Defendant was convicted of one count of murder in violation of R.C. 2903.02(A), which states that "[n]o person shall purposely cause the death of another * * *" and one count of murder in violation of R.C. 2903.02(B), which states that "[n]o person shall cause the death of another as a proximate result of the offender's committing * * * an offense of violence that is a felony of the first or second degree * * *."

**{¶92}** Even though involuntary manslaughter is a lesser included offense of murder in the abstract, "a charge on the lesser included offense is warranted only if the evidence adduced at trial would support it." *State v. Thomas*, 40 Ohio St.3d 213, 216, 533 N.E.2d 286 (1988).

**{¶93}** In *State v. Clark*, 8th Dist. No. 89371, 2008-Ohio-1404, ¶ 42, this court held that a jury instruction on involuntary manslaughter was not warranted, because "the evidence presented at trial [did] not reasonably support an acquittal on the charges for

aggravated murder [as] the evidence established that Clark acted purposely when he shot and killed [the victim]."

{¶94} In his March 14, 2007 statement to the police, defendant said that when Rankin attempted to grab the gun away from defendant during the robbery, defendant "pulled the trigger to get him to let go of my hand." In *State v. Mackey*, 8th Dist. No. 75300, 1999 Ohio App. LEXIS 5902 (Dec. 9, 1999), this court held that a "jury can infer intent to kill by the defendant's use of a firearm, an inherently dangerous instrumentality, the use of which is likely to produce death." (Citing *State v. Widner*, 69 Ohio St.2d 267, 431 N.E.2d 1025 (1982).)

{¶95} Because the evidence at trial — namely that defendant purposefully fired the gun — supports a murder conviction under both R.C. 2903.02(A) and (B), we find no error in the court's refusing to instruct the jury on involuntary manslaughter. Additionally, an instruction on negligent homicide was improper as a matter of law. Accordingly, defendant's 14th assignment of error is overruled.

Sufficiency and Weight of the Evidence

XV.

Defendant was denied due process of law when the court overruled his motion for judgment of acquittal.

XVI.

Defendant is entitled to a new trial because the verdicts are against the manifest weight of the evidence.

**{¶96}** Defendant challenges all six of his convictions, claiming that they were not supported by sufficient evidence, and that "the multiple contradictions, outright lies and uncorroborated testimony together with the lack of proof leads one to conclude that the verdicts are against the manifest weight of the evidence."

**{¶97}** Defendant fails to point to any particular element within his convicted offenses or any specific evidence or testimony in the record to support his argument. Nonetheless, we review his convictions and trial in toto.

**{¶98}** Defendant was convicted of one count of murder in violation of R.C. 2903.02(A), which states that "[n]o person shall purposely cause the death of another * * *" and one count of murder in violation of R.C. 2903.02(B), which states that "[n]o person shall cause the death of another as a proximate result of the offender's committing * * * an offense of violence that is a felony of the first or second degree * * *."

**{¶99}** Defendant was also convicted of aggravated robbery in violation of R.C. 2911.01(A)(1) and (3), which state that "No person, in attempting or committing a theft offense * * * shall * * * [h]ave a deadly weapon * * * and * * * use it; [or] [i]nflict * * * serious physical harm on another."

**{¶100}** Additionally, defendant was convicted of aggravated burglary in violation of R.C. 2911.11(A)(1) and (2), which state that "No person, by force, stealth, or deception, shall trespass in an occupied structure * * *, when another person other than an accomplice of the offender is present, with purpose to commit in the structure * * * any

criminal offense, if * * * [t]he offender inflicts * * * physical harm on another; [or] [t]he offender has a deadly weapon * * *."

{¶101} An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997).

{¶102} The proper test for an appellate court reviewing a manifest weight of the evidence claim is as follows:

> The appellate court sits as the "thirteenth juror" and, reviewing the entire record, weighs all the reasonable inferences, considers the credibility of witnesses and determines whether, in resolving conflicts in evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

*Id.* at 387.

{¶103} Determinations of witness credibility are primarily left to the trier of facts. *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967).

{¶104} According to the record in the instant case, the following pertinent evidence was presented at trial:

{¶105} Dillard testified that on February 28, 2007, he drove defendant and two other men to a house on the west side of Cleveland, because defendant told the group he wanted to look into buying a car from someone. Dillard dropped defendant and one of the men (whom Dillard allegedly did not know) off at this house, then Dillard began to drive away. At the first stop sign, Dillard received a call from the other man, who stated that defendant was "tripping." Dillard went back to the house and picked defendant and the man up. According to Dillard, "the whole demeanor of [defendant] had changed since before he went in."

{¶106} When defendant got in Dillard's car, defendant made a phone call. Dillard overheard defendant say "it got a little ugly inside of the house" and defendant "had to pop somebody." Dillard testified that defendant said he went into the house looking for money in the heating vent based on "a job he had did before." Defendant said that he had a gun, the man in the house tried to take it, and "[t]he gun went off and hit [Rankin] in the leg."

{¶107} Dillard drove back to the east side of town and stopped at a gas station. Dillard testified that defendant had small wallet and a revolver on him when "he lifted his shirt up." Defendant offered to pay for gas with "a credit card or something that he had got * * *." Defendant's offer was refused, and he threw the contents of the wallet up in the air. Surveillance video from the gas station shows this happening, and various forms of identification, receipts, and scraps of paper belonging to Rankin were recovered from the scene and introduced into evidence.

{¶108}   David Ali, the owner of the gas station, testified that on February 28, 2007, a group of young men pulled into the gas station, and one of them got out of the car and threw a bunch of papers into the air.   One of the other men said, "[D]amn, Stacey, why you do that there?"   According to the record, defendant's nickname is "Stacey." Ali later picked the papers up and found "medical cards, Sam's club cards, driver's license, stuff like this" belonging to an older gentleman.   Ali called the phone number on one of the cards attempting to give the items back to the owner.   Ali never reached anyone at the number.   A couple of days later, Ali read an article in the newspaper about a homicide near his gas station.   The victim's name was Glen Rankin, which is the same name on the cards he found in his parking lot.

{¶109}   Ali called the police, told them what he knew, and gave them the gas station's surveillance video.   Additionally, Ali told the police that the "kid who tossed that stuff like up in the air" was the same person who was on the cover of Scene magazine regarding the Glenville High School football program.   Ali testified that he graduated from Glenville, and he took a particular interest in the neighborhood including this magazine cover story.

{¶110}   Ginn's testimony at trial was substantially the same as his suppression hearing testimony.   Ginn received a phone call in March 2007 from defendant, who was in jail asking for help.   The next time Ginn spoke with defendant, defendant stated that he was "tired," and he wanted to do the right thing and make a statement to the police. The only details that Ginn learned from defendant was that there was a "robbery went bad

and someone was killed." Ginn was not present when defendant made his statement to the detectives, because Ginn broke down and left the room.

{¶111}   Det. Morgan testified that he was investigating Rankin's death when he received a phone call from Ali on March 4, 2007.   The police went to Ali's gas station, where Ali turned over the contents of Rankin's wallet, the video from the surveillance camera showing defendant throwing the items up into the air, and a copy of the Scene magazine with defendant on the cover.   The remainder of Det. Morgan's testimony is consistent with his testimony from the suppression hearing.

{¶112}   In defendant's March 14, 2007 written statement, he confessed that he planned to rob Rankin's house, but when he entered, Rankin "grabbed the gun, and almost had gained possession of it, so I pulled the trigger to get him to let go of my hand.  He stumbled back and landed on his butt and ended up flat on his back."   Defendant searched the house, but found no money other than what was in Rankin's wallet. Defendant "hit [Rankin] in the forehead with the left side of the pistol. [Rankin] again grabbed my wrist, but this time I was able to yank the gun away from his grasp. * * * I heard [Rankin] complaining that his hip was numb when we were leaving the house."

{¶113}   In summary, the evidence shows that defendant planned to rob Rankin, then fatally shot Rankin during the robbery.   Defendant admitted  to intentionally pulling the trigger of the gun.   It is long-standing law in Ohio that intent to kill may be inferred when a deadly weapon is used.

> The accepted rule that a person must be held to intend the natural and probable consequences of his act evolved from cases dealing with the

use of dangerous weapons and instrumentalities, such as guns, knives, clubs and other lethal objects. A person using such deadly and destructive objects is held, under the law, to intend the natural and probable consequences resulting from the manner in which such objects were used.

*State v. Butler*, 11 Ohio St.2d 23, 34, 227 N.E. 627 (1967). Accordingly, defendant's 15th and 16th assignments of error are overruled.

Allied Offenses

## XVII.

Defendant was subjected to unconstitutional multiple punishments when the court failed to merge the murder, aggravated robbery and aggravated burglary convictions.

## XVIII.

Defendant was denied due process of law when the court failed to have the prosecutor elect which offenses to sentence on.

**{¶114}** The Ohio Supreme Court established the proper analysis for determining whether offenses qualify as allied offenses subject to merger pursuant to R.C. 2941.25 in *State v. Johnson*, 128 Ohio St.3d 153, 2010-Ohio-6314, 942 N.E.2d 1061, ¶ 48-50.

> In determining whether offenses are allied offenses of similar import under R.C. 2941.25(A), the question is whether it is possible to commit one offense and commit the other with the same conduct, not whether it is possible to commit one without committing the other. * * * If the offenses correspond to such a degree that the conduct of the defendant constituting commission of one offense constitutes commission of the other, then the offenses are of similar import.

> If the multiple offenses can be committed by the same conduct, then the court must determine whether the offenses were committed by the same conduct, i.e., "a single act, committed with a single state of mind."

> If the answer to both questions is yes, then the offenses are allied offenses of similar import and will be merged. (Citation omitted.)

*Id.*

{¶115} Furthermore, "it is the state that chooses which of the allied offenses to pursue at sentencing * * *." *State v. Whitfield*, 124 Ohio St.3d 319, 2010-Ohio-2, 922 N.E.2d 182, ¶ 20.

> In conferring that right on the state, the legislature did not specify when the state must make that election. The Legislative Service summary states that "the prosecution *sooner or later* must elect as to which offense it wishes to pursue," (emphasis added), *id.*, thereby implying that the state has latitude in determining when to decide which offense to pursue at sentencing.

*Id.*

{¶116} In the instant case, the court sentenced defendant as follows: it merged the two murder convictions and sentenced defendant to life in prison with the possibility of parole after 15 years; it merged the two aggravated robbery convictions and sentenced defendant to ten years in prison; it merged the two aggravated burglary convictions and sentenced defendant to ten years in prison; and it merged all firearm specifications and sentenced defendant to three years in prison. The court ordered all sentences to be served consecutively for an aggregate prison term of life with the possibility of parole after 38 years.

{¶117} Defendant argues that his murder, aggravated robbery, and aggravated burglary convictions are allied offenses subject to merger for sentencing. Defendant also argues that the court erred when it failed to require the State to elect which allied

offense to pursue at sentencing in violation of *State v. Whitfield*, 124 Ohio St.3d 319, 324, 2010-Ohio-2, 922 N.E.2d 182.

{¶118} Upon review, we find that the State did not elect which of the merged convictions to pursue at sentencing. It is unclear from the record whether the court sentenced defendant on the purposeful murder or the felony murder. Additionally, it is unclear whether the court sentenced defendant on the aggravated robbery in violation of R.C. 2911.01(A)(1) or (A)(3) and the aggravated burglary in violation of R.C. 2911.11(A)(1) or (A)(2).

{¶119} However, because the crimes at issue are not allied offenses, we find any resulting error to be harmless.

{¶120} In *State v. Johnson*, 88 Ohio St.3d 95, 723 N.E.2d 1054 (2000), the Ohio Supreme Court held that aggravated murder, aggravated robbery, and aggravated burglary were not allied offenses.

> Appellant committed aggravated burglary when he entered the home occupied by Shanon with the intent to commit a crime, carrying a ball bat as a weapon. He committed aggravated robbery when he viciously beat Shanon with the bat and took money from her purse. He committed aggravated murder when he killed Shanon. As a result, the offenses at issue were committed separately and with a separate animus.

*Id.* at 115.

{¶121} Although defendant was convicted of murder and felony murder, rather than aggravated murder, the same reasoning applies to determine that the offenses at issue are not allied and do not merge for the purpose of sentencing. At the August 24, 2009 sentencing hearing, the court found that "defendant went into this home to commit an aggravated burglary, but his intent * * * changed as he encountered the victim and,

therefore, * * * both the aggravated robbery and the aggravated burglary are crimes of a separate animus." *See, e.g.*, *State v. Keene*, 81 Ohio St.3d 646, 668, 693 N.E.2d 246 (1998) ("felony-murder under R.C. 2903.01(B) is not an allied offense of similar import to the underlying felony"); *State v. Allen*, 8th Dist. No. 92482, 2010-Ohio-9, ¶ 69 (felony murder and aggravated robbery are not allied offenses because one requires the death of a person and the other does not).

{¶122} Accordingly, defendant's 17th and 18th assignments of error are overruled.

Sentencing

XIX.

Defendant was denied his Sixth Amendment rights when he was sentenced to a consecutive sentence based on judicial factfinding.

{¶123} Defendant argues that it was error for the court to sentence him to consecutive prison terms "based on judicial factfinding that defendant had a separate animus as defendant entered the home in order to commit an aggravated burglary which changed when he enountered the victim." Upon review, we find that defendant's sentence was not based on the court's finding that he committed the offenses with a separate animus. Rather, as discussed in our analysis of defendant's 17th assignment of error, the court properly made that finding in relation to the merger of allied offenses.

{¶124} Defendant's 19th assignment of error is factually inaccurate and, therefore, overruled.

Ineffective Assistance of Counsel

Defendant was denied effective assistance of counsel.

**{¶125}** To substantiate a claim of ineffective assistance of counsel, a defendant must demonstrate that (1) the performance of defense counsel was seriously flawed and deficient, and (2) the result of defendant's trial or legal proceeding would have been different had defense counsel provided proper representation. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *State v. Brooks*, 25 Ohio St.3d 144, 495 N.E.2d 407 (1986). In *State v. Bradley*, the Ohio Supreme Court truncated this standard, holding that reviewing courts need not examine counsel's performance if the defendant fails to prove the second prong of prejudicial effect. *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989). "The object of an ineffectiveness claim is not to grade counsel's performance." *Id.* at 143.

**{¶126}** Specifically, defendant argues that counsel was ineffective for the following reasons: failure to request jury instructions on accidental shooting; failure to move to suppress his March 14, 2007 statement to police; and failure "to object to various flawed jury instructions which did not include essential elements of the offense."

**{¶127}** Upon review, we find that there was no evidence presented at trial that the shooting was accidental. Therefore, a jury instruction on an accidental shooting was not warranted. Additionally, defendant's motion to suppress included his March 14, 2007 statement to police. Finally, we concluded in defendant's eighth, ninth, tenth,

11th, and 12th assignments of error that the court properly instructed the jury. Accordingly, defendant's 22nd and final assignment of error is overruled.

{¶128}    Judgment affirmed.

It is ordered that appellee recover of appellant its costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the   Common Pleas Court to carry this judgment into execution.    Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____

JAMES J. SWEENEY, PRESIDING JUDGE

COLLEEN CONWAY COONEY, J., and
EILEEN A. GALLAGHER, J., CONCUR