[Cite as *State v. Zimmer*, 2017-Ohio-4440.]

# Court of Appeals of Ohio

### EIGHTH APPELLATE DISTRICT
### COUNTY OF CUYAHOGA

---

### JOURNAL ENTRY AND OPINION
### No. 104946

---

## STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

## LEO A. ZIMMER

DEFENDANT-APPELLANT

---

### JUDGMENT:
### AFFIRMED

---

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-16-602862

**BEFORE:** Blackmon, J., E.T. Gallagher, P.J., and Celebrezze, J.

**RELEASED AND JOURNALIZED:** June 22, 2017

-i-

**ATTORNEY FOR APPELLANT**

Daniel J. Misiewicz
Law Office of Daniel J. Misiewicz
614 Superior Avenue, Suite 1300
Cleveland, Ohio 44113


**ATTORNEYS FOR APPELLEE**

Michael C. O'Malley
Cuyahoga County Prosecutor

By: Andrew F. Rogalski
Assistant County Prosecutor
Justice Center, 9th Floor
1200 Ontario Street
Cleveland, Ohio 44113

PATRICIA ANN BLACKMON, J.:

{¶1} Leo A. Zimmer ("Zimmer") appeals his convictions for various sexual offenses and assigns the following errors for our review:

I.    The trial court erred in denying defendant-appellant's motion for acquittal pursuant to Ohio Criminal Rule 29.

II.    Defendant-appellant's convictions are against the manifest weight of the evidence.

{¶2} Having reviewed the record and pertinent law, we affirm. The apposite facts follow.

{¶3} On February 9, 2016, Zimmer was indicted for various sexual offenses relating to A.C., whose date of birth is April 2, 1995, and A.B., whose date of birth is October 26, 1991. The incidents were alleged to have occurred almost exclusively at Zimmer's family's home on Pershing Avenue in Cleveland ("the Pershing house") between 1999 and 2009.

{¶4} On July 1, 2016, after a bench trial, the court found Zimmer guilty of two counts of rape in violation of R.C. 2907.02(A)(1)(b); three counts of rape in violation of R.C. 2907.02(A)(2); five counts of kidnapping in violation of R.C. 2905.01(A)(4); and one count of gross sexual imposition ("GSI") in violation of R.C. 2907.05(A)(4).

{¶5} On August 18, 2016, the court sentenced Zimmer to two terms of life in prison for rape of a child under the age of 13; ten years in prison each for three counts of forcible rape; and ten years in prison for the kidnapping associated with the GSI. The other kidnapping convictions merged into the associated rape convictions, and the GSI

merged into the associated kidnapping conviction. The court ordered all sentences to be served concurrently.

{¶6} It is from these convictions that Zimmer appeals.

## Sufficiency of the Evidence

{¶7} Crim.R. 29 mandates that the trial court issue a judgment of acquittal where the prosecution's evidence is insufficient to sustain a conviction for the offense. Crim.R. 29(A) and sufficiency of the evidence require the same analysis. *State v. Taylor*, 8th Dist. Cuyahoga No. 100315, 2014-Ohio-3134.

> An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.

*State v. Driggins*, 8th Dist. Cuyahoga No. 98073, 2012-Ohio-5287, ¶ 101, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997).

{¶8} In the case at hand, Zimmer argues that the state "failed to present any evidence that [A.C. and A.B.] were ever moved or restrained in any way" in support of his kidnapping convictions. Zimmer was convicted of five counts of kidnapping in violation of R.C. 2905.01(A)(4), which states that "[n]o person, * * * in the case

of a victim under the age of thirteen * * * by any means, shall remove another from the place where the other is found or restrain the liberty of the other person, * * * [t]o engage in sexual activity * * * with the victim against the victim's will * * *."

{¶9} In *State v. Ramos*, 8th Dist. Cuyahoga No. 103596, 2016-Ohio-7685, ¶ 14, this court held that, concerning merged offenses, if "there is sufficient evidence to support the offense on which the state elects to have the defendant sentenced, the appellate court need not consider the sufficiency of the evidence on the count that is subject to merger because any error would be harmless * * *."

{¶10} Pursuant to *Ramos*, therefore, we need only consider the sufficiency of the evidence concerning Zimmer's kidnapping conviction associated with the GSI. This kidnapping is charged in count eight of the indictment, which states that, between April 1999 and April 2001, Zimmer restrained A.C.'s liberty "by any means * * * for the purpose of engaging in sexual activity * * *." The indictment further states that A.C. was four to five years old when this kidnapping occurred. It is important to note that, because the victim was under the age of 13, the state need not prove that the kidnapping was the result of force, threat, or deception.

{¶11} At trial, A.C. testified as follows about this incident.

{¶12} A.C. first met Zimmer when she was about five years old. A.C. spent "a lot of time" at the Pershing house, because A.C.'s aunt was dating Zimmer. From the time she was in second grade to the time she was in ninth grade, A.C. and her mom lived with Zimmer and A.C.'s aunt in the Pershing house. According to A.C., other people also

lived there, including Zimmer's parents, Zimmer's siblings and their spouses, and A.B., who is Zimmer's great-niece.

{¶13} A.C. did not specifically remember the first time that Zimmer touched her inappropriately, but she testified that "I have certain memories of me sitting on his lap, and if I were to have a dress on or a skirt, his hand reaching up and just touching inappropriately in ways, and * * * just fondling through, like, my clothes or under my dresses if I were to be close to him or sitting on his lap."

{¶14} A.C. recalled a specific incident that occurred at the home of Zimmer's cousin[1] when A.C. was "about" in the second grade. "I was supposed to be sleeping on the couch with my cousin in the living room while I believe [the adults] were playing cards in the dining room, slash, kitchen. And [Zimmer] came to check on us, and we weren't sleeping yet. And I do remember him putting his hand in my pants that night. * * * He played on the outside of my vagina."

{¶15} This court has held that, in relation to kidnapping, "a child's liberty may be restrained through the inherent social/psychological pressures that accompany" an adult-child familial relationship. *State v. Weems*, 8th Dist. Cuyahoga No. 102954, 2016-Ohio-701, ¶ 25. *See also State v. Diaz*, 8th Dist. Cuyahoga No. 103878, 2016-Ohio-5523. Given the tender age of A.C. when this GSI occurred, the fact that Zimmer is 17 years older than A.C., and A.C.'s testimony that she was part of "the

---

[1]This is the only evidence of abuse that took place outside of the Pershing house.

Zimmer family unit," we find sufficient evidence to show that A.C.'s liberty was restrained when Zimmer molested her.

{¶16} Furthermore, after the defense moved for a Crim.R. 29 acquittal, the court asked defense counsel whether there was a specific count or element of which the state failed to introduce evidence. Defense counsel responded as follows: "Well, Your Honor, I believe that they have touched upon every count that's pending, so I don't have anything specific to point out."

{¶17} Accordingly, Zimmer's first assigned error is overruled.

<u>**Manifest Weight of the Evidence**</u>

{¶18} In *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 25, the Ohio Supreme Court addressed the standard of review for a criminal manifest weight challenge, as follows:

The criminal manifest-weight-of-the-evidence standard was explained in *State v. Thompkins* (1997), 78 Ohio St.3d 380, 1997 Ohio 52, 678 N.E.2d 541. In *Thompkins*, the court distinguished between sufficiency of the evidence and manifest weight of the evidence, finding that these concepts differ both qualitatively and quantitatively. *Id.* at 386, 678 N.E.2d 541. The court held that sufficiency of the evidence is a test of adequacy as to whether the evidence is legally sufficient to support a verdict as a matter of law, but weight of the evidence addresses the evidence's effect of inducing belief. *Id.* at 386-387, 678 N.E.2d 541. In other words, a reviewing court asks whose evidence is more persuasive — the state's or the defendant's?

We went on to hold that although there may be sufficient evidence to support a judgment, it could nevertheless be against the manifest weight of the evidence. *Id*. at 387, 678 N.E.2d 541. "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a 'thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony." *Id.* at 387, 678 N.E.2d 541, citing *Tibbs v. Florida* (1982), 457 U.S. 31, 42, 102 S.Ct. 2211, 72 L.Ed.2d 652.

{¶19} An appellate court may not merely substitute its view for that of the jury, but must find that "in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Thompkins* at 387. Accordingly, reversal on manifest weight grounds is reserved for "the exceptional case that the evidence weighs heavily against the conviction." *Id.*

{¶20} In the case at hand, Zimmer argues that various inconsistencies in the witnesses' testimony created "credibility issues" in the state's case. For example, A.C. failed to testify about the medical treatment she received after disclosing the abuse to her mother, and Zimmer argues this "reflects on [her] credibility as a witness." Additionally, A.B. did not disclose the abuse until Zimmer began dating her uncle's ex-wife, "a fact which led to a great deal of animosity within the * * * house." According to Zimmer, A.B. "had personal motivation to see [him] punished," and she failed to disclose the abuse in a timely manner. Finally, Zimmer argues that the detective did not interview

A.B.'s sister, who was allegedly in the room when one of the assaults occurred, nor did the detective further investigate why A.C. was in counseling.

{¶21} A.C. testified that eventually Zimmer's abuse escalated from inappropriate touching to penetration and occurred "[i]n the bedroom or on the couch, depending on where anybody else in the house was * * *." A.C. testified about "being in a bedroom, in a nightgown, under the blankets, watching a movie, and it was right after a bath. My mother was not home. * * * And I remember him coming into the room and playing around on the bed. And I remember being under the blanket and him going up under my nightgown and penetrating my vagina" with his hands. A.C. believes she was "either seven or eight years old" when this happened.

{¶22} A.C. also testified that Zimmer took her virginity when she was 13 years old. According to A.C., Zimmer "climbed into the bed with me, and he reeked of alcohol. And then he took my pants off, and he penetrated my vagina with his mouth, and then climbed on top of me and proceeded to penetrate me with his penis. He stuck it inside of me for — I don't remember how long it lasted, but I know it didn't last very long."

{¶23} A.C. testified that she did not say anything or try to stop Zimmer because she was "kind of frozen" when it happened.

{¶24} A.C. testified that when she was 13 or 14 years old, she told her boyfriend that Zimmer took her virginity. Additionally, when A.C. was 14 years old, she wrote a letter to her mother telling her what Zimmer had done. A.C.'s mother did not talk to A.C. for two days before they had a face-to-face conversation about the abuse. A.C.

testified that she wanted Zimmer out of her life and she wanted "to forget about it." Neither A.C. nor her mother reported the allegations to anyone. According to A.C., her mother's reaction — or lack thereof — resulted in A.C. not going to the authorities to report the abuse. "Her not speaking to me for two days, I think that played a big part in me not going to anybody else. I didn't want to see what anybody else's reaction would be."

{¶25} A.B. also testified for the state about her allegations against Zimmer. A.B. testified that she would spend "almost every weekend" and part of the summers at the Pershing house from when she was in the third or fourth grade until she was 15 or 16 years old. Zimmer, who is A.B.'s great uncle, was living in the house. A.B. spent a lot of time with A.C., who was also living there. Eventually the girls referred to each other as "cousin."

{¶26} A.B. testified that she was in the fourth or fifth grade when Zimmer first inappropriately touched her. "I remember that my mom dropped me off there to go Christmas shopping or something one time, and we were watching a movie on the couch * * *. And I don't remember the movie. But I remember that [Zimmer] got a blanket, and then he started touching me on my vagina, and then he put his penis inside of me."

{¶27} A.B. testified that although "[e]verything kinda meshes together," she recalled another specific incident of Zimmer molesting her when she was in the fourth or fifth grade. A.B. was laying on a "roll out bed" under "white hospital blankets." A.B.'s sister and A.C. were on the couch, and the three girls were watching a movie. "And

[Zimmer] came over and sat next to me and started touching me with his fingers inside my vagina * * * [u]nderneath the blanket."

{¶28} A.B. testified that on another occasion when she was in the sixth grade, Zimmer "was wrapping Christmas presents in the attic at the Pershing house. And I went upstairs, and he put me onto his lap and started kissing me, and then he started touching me up there [and] through my pants." A.B. recalled another incident that happened in the upstairs unit of the house, where Zimmer's father — who is A.B.'s great-grandfather — lived. Zimmer, A.B., and the great-grandfather were in the living room watching TV. Zimmer and A.B. were on the couch under a blanket, and Zimmer put his fingers inside A.B.'s vagina. "I just remember [Zimmer] and great grandpa looking at each other, and I felt like great grandpa knew what was going on."

{¶29} A.B. further testified that Zimmer stopped abusing her when she was in the eighth grade, because she "stopped hanging around the house so much." A.B. testified that she did not want these things to happen, but she did not tell Zimmer to stop because "he was older than me, an adult. * * * I pretended like it never happened." A.B. further testified that she was scared, but she got "used to it." Asked what she was scared of, A.B. answered: "If I wanted him to stop and he didn't. Because it could have been more forceful if I would have said no."

{¶30} Both victims testified consistently about when they eventually reported the sexual abuse. On December 14, 2015, A.B. told A.C. via text messages that Zimmer was dating a woman named Shawna, who had previously been married to A.B.'s uncle. Shawna and A.B.'s uncle had children together, and A.B. was concerned about the

possibility of those children being abused by Zimmer. A.C. testified that this information made her "very sad and * * * very nervous because I had a feeling of what I was going to have to do to make that feeling * * * in my stomach go away * * *." According to A.C., their main goal was about "protecting the kids."

{¶31} The text messages between the two victims, which were introduced at trial, follow:

A.B.   Dude Leo is dating Shawna my uncles ex and she has 3 girls including my cousin * * *. What can we do to prevent anything from happening to them. * * *

A.C.   Oh my god. I'm gonna have a panic attack.

A.B.   Be careful with your thoughts and words. Let's not manifest anything. Let's just figure out the best way to save them together. [My sister] told me 2 days ago and I've thought about it a little but I just seen him post pics of all them on his [Facebook page].

A.C.   [O]kay. Your right. But I know what's gonna happen. I can't let [it] happen.

A.B.   We will stop it from happening. * * * My [other] uncle * * * is in Columbus. He told my mom he would try and get them but basically he gave up on being a dad. And now his kid[s'] mom is with that. * * *

A.C.   I'll do whatever I can. Tell your uncle what Leo did to us. We have to get involved to save them. I'm gonna be sick dude. I've had a bad feeling the past 2 days. M[y] chest has been heavy like something bad was gonna happen and now it makes sens[e]. * * *

A.B.   * * * Do we get the courts involved, like how do we go about this? My uncle is not rational, and he's not very smart.

A.C.   * * * I think the courts should be involved. I'm scared.

A.B.   * * * I'm scared too. * * * They are all so crazy. We can't let that happen. Can we like call anonymous to social services? Do we put

him in jail and go to the courts. [I don't know] what to do or who to ask advice from about this. * * * But there's kids involved now. I can't live knowing I didn't do anything to protect them.

A.C. We can't be [anonymous] if we're the prime witnesses. I'm gonna talk to someone tomorrow about it. See what we can do.

A.B. Okay. I'm hoping some solution comes to me in my dreams. Let's stay connected tonight so we can figure it out together. I'm sorry I wasn't there for you when this happened to you. I'm sorry I didn't tell anybody sooner to protect you.

A.C. Do you work tomorrow and what time. I'm off all day. * * * I'm scared * * *. My chest has been so heavy and now it's worse. I don't like this. We have to save them. I love you.

{¶32} A.C. and A.B. went to the Cleveland police station later that day and filed a report.

{¶33} Asked why she and A.C. reported Zimmer's abuse in December 2015, A.B. testified, "Because I felt now is the time that we need to go to the authorities about what happened to us to protect the kids." A.B.'s testimony continued as follows:

I found out that Zimmer was dating * * * my uncle's ex-wife * * *. And then a couple days later, a couple nights later I was on Facebook, and I saw that there were pictures with [Zimmer's girlfriend's] children on Facebook, Christmas pictures downtown. * * * I tried to avoid thinking about what could possibly be happening to those children. And when I saw the pictures, it just kinda hit me. And I texted [A.C.] and told her what I knew, and we made the decision to go forward and go to the authorities.

{¶34} A.B. testified that she was sexually abused by two other men and she reported both of them to the authorities. However, she did not mention Zimmer abusing her during either of these investigations. Additionally, A.B. testified that, subsequent to the abuse, she saw Zimmer on a few social occasions but still did not report any of the incidents to the authorities or another adult.

**{¶35}** Asked to explain why her trial testimony was more detailed than the report she previously gave to the police, A.B. stated as follows:

> I spent my whole life pretending like this never happened. And when I made the — I don't want to say rash, but maybe rash decision to come to the authorities about what happened, I never fully collected all of my thoughts. We just kinda did it, you know, I just told people what happened. And over time I started opening up different parts of my brain and digging deeper into my subconscious to pull out different memories. * * * I grabbed a notebook, and I just started writing different things to take myself back there.

**{¶36}** A.B. also sent an email to the detective prior to trial: "I'm sorry that I couldn't have gotten these memories together beforehand, and I had to dig deep into my subconscious to find them. And it was really hard because I'm trying not to drive myself crazy with them, memories of what happened."

**{¶37}** A.C.'s ex-boyfriend testified that the two dated when A.C. was 13 to 16 years old. He testified that he no longer had any contact with A.C., he did not like A.C., and he was "extremely pissed" that he had to testify. Nonetheless, the ex-boyfriend stated that in 2009, when they were dating, A.C. told him she lost her virginity to Zimmer when Zimmer raped her. This testimony corroborates A.C.'s testimony.

**{¶38}** Lillian, who is A.C.'s mom, testified that in 2010, she received a letter from her daughter A.C., when A.C. was 14 years old, accusing Zimmer of inappropriately touching her and A.B. when they had spent the night at the Pershing house in the past. This corroborates A.C.'s testimony. According to Lillian, A.C. did not want to talk about the details nor did she want to report the abuse to the authorities. Lillian took A.C. to a counselor. "I did my best to get her to open up to me, and she was not comfortable

talking to me.   And I thought that maybe a professional would be better * * *." However, A.C. "only went to a few sessions" then "made a decision not to go any further."

{¶39} Lillian testified that she did not know about this trial until the state called her the night before her testimony.  She was caught off guard and told them what she could; however, she did not think to tell them over the phone that A.C. saw a counselor. According to Lillian, this is why the counseling was brought up for the first time during her testimony.

{¶40} Cleveland Police Detective Richard Durst testified that he interviewed A.C. and A.B. on the same day, but separately.   According to Durst, during his seven years as a detective in the sex crimes unit, he has experience with cases involving "delayed disclosure" of abuse of minor children.  Asked how common this is, Durst replied, "I would say it's a third of my case load."   Detective Durst testified that both A.C. and A.B. stated they decided to come forward with the allegations after seeing pictures on Facebook of Zimmer with his girlfriend's small children.

{¶41} Durst was asked if he interviewed J.B., who is A.B.'s sister, and he said, "No."   Durst testified that he first learned that A.C. allegedly went to a counselor about being molested by Zimmer during Zimmer's trial.   He also testified that, by law, if felony sexual abuse had been reported to a counselor, that counselor would be obligated to turn the information over to the authorities.

{¶42} Shawna Kerns, who testified for the defense, stated that she is currently dating Zimmer, but used to be married to Zimmer's nephew.   Kerns is an aunt to A.B.

and a family friend to A.C. Kerns was close with both girls when they were living and/or staying at the Pershing house; however, their relationships deteriorated by 2010 after Kerns's divorce. Her four kids are in the Cuyahoga County Department of Children and Family Services system relating to domestic abuse by Kerns's ex-boyfriend. Zimmer currently watches her kids at times when she is working, and Kerns told the social worker about the allegations against Zimmer. The social worker interviewed Kerns's four children, but the county did not take any action as a result of the interviews.

{¶43} Zimmer's mother and sister also testified on behalf of the defense. They both testified that they have lived in the upstairs part of the Pershing house since the 1970s. They also testified about the various times they saw A.B. and A.C. over the years at the Pershing house and family functions, but that neither A.B. nor A.C. ever mentioned that Zimmer sexually abused them.

{¶44} In reviewing this evidence, we cannot say that the court lost its way in convicting Zimmer of raping and kidnapping A.B. and A.C. when they were children. The delayed disclosure and failure to initially report all the details testified to at trial are the result of A.B. and A.C. pretending the abuse did not happen, because of the circumstances under which they were raised. As the court stated when it found Zimmer guilty, it "was not particularly surprised that the evidence was necessarily lacking in some detail," because the abuse took place "somewhere between 10 and 17 years ago" and the "victims were young." The court found that A.B. and A.C. "came from somewhat chaotic family circumstances," including "the distinct impression from the evidence that Lillian * * * was not perhaps a stellar parent * * *."

**{¶45}** Additionally, the court stated that Zimmer's "household [was] crowded with different adults, adults that would have no direct or immediate responsibility for either [A.C. or A.B.] when they were dropped off there or staying there or living there." The court further stated that "it was clear * * * that non-immediate family members were permitted to move into 5080 Pershing as needed, and they might be accompanied by a spouse or children." The court continued:

> So I paint that picture because when one looks back and asks the question how could events like this be occurring with no one noticing, it struck the Court that this very loose amalgam of human beings with no direct responsibilities for young children might well explain how things like this could occur with no one paying particular attention.

**{¶46}** Upon review of the record, we find consistent and credible evidence for why the victims delayed reporting the abuse and why A.C. did not testify about counseling she allegedly received after the abuse. Additionally, we find that the detective's failure to interview J.B. about her recollections of the allegations is not an issue. "It is well settled that a rape conviction may rest solely on the victim's testimony, if believed * * *." *State v. Patterson*, 8th Dist. Cuyahoga No. 100086, 2014-Ohio-1621, ¶ 40. "There is no requirement that a rape victim's testimony be corroborated as a condition precedent to conviction." *State v. Lewis*, 70 Ohio App.3d 624, 638, 591 N.E.2d 854 (4th Dist.1990).

**{¶47}** Accordingly, we find that Zimmer's convictions were not against the weight of the evidence, and his second assigned error is overruled.

**{¶48}** Judgment affirmed.

It is ordered that appellee recover of appellant its costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to the Cuyahoga County Court of Common Pleas to carry this judgment into execution.   The defendant's conviction having been affirmed, any bail pending appeal is terminated.   Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
PATRICIA ANN BLACKMON,   JUDGE

EILEEN T. GALLAGHER, P.J., and
FRANK D. CELEBREZZE, JR., J., CONCUR