[Cite as *State v. McDaniel*, 2020-Ohio-489.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

STATE OF OHIO,                          :

    Plaintiff-Appellee,          :

                                    No. 108282

    v.                            :

ARTHUR MCDANIEL,                        :

    Defendant-Appellant.          :

---

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** February 13, 2020

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-18-633120-A

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Kelly N. Mason, Assistant Prosecuting Attorney, *for appellee.*

Thomas Rein, *for appellant.*

KATHLEEN ANN KEOUGH, J.:

{¶ 1} Defendant-appellant, Arthur McDaniel, appeals from his convictions for rape, sexual battery, gross sexual imposition, and kidnapping. He contends that (1) his convictions were not supported by sufficient evidence and were against the manifest weight of the evidence, (2) the trial court committed reversible error

because it failed to inquire of him whether he wanted to testify, (3) he was denied his right to effective assistance of counsel, and (4) the trial court failed to make the requisite statutory findings to impose consecutive sentences.  Finding no merit to the appeal, we affirm.

## I.    Background

{¶ 2}    McDaniel was indicted in a 28-count indictment that charged him with rape, attempted rape, sexual battery, attempted sexual battery, gross sexual imposition, kidnapping, and disseminating matter harmful to juveniles, all relating to incidents involving his stepdaughters, L.B. and M.B.  McDaniel pleaded not guilty, and the matter proceeded to trial.  After the presentation of the state's case, the court granted McDaniel's Crim.R. 29 motion for acquittal in part and dismissed Count 15, disseminating matter harmful to juveniles.

{¶ 3}    The jury found McDaniel guilty of five counts of rape, three counts of sexual battery, one count of gross sexual imposition, and one count of kidnapping involving L.B.; the jury found that L.B. was under the age of 13 at the time of two of the sexual batteries, and that McDaniel committed the kidnapping with a sexual motivation.  The jury further found on one of the rape counts that L.B. was under age 13 but older than 10, and that McDaniel purposely compelled her to submit by force or threat of force.

{¶ 4}    The jury found McDaniel guilty of three counts of rape, four counts of gross sexual imposition, and one count of kidnapping involving M.B.  After a hearing

on the sexually violent predator specification attendant to several counts; the jury found that McDaniel is not a sexually violent predator.

{¶ 5} At sentencing, the trial court sentenced McDaniel to an aggregate concurrent prison sentence of a minimum term of 25 years and a maximum term of life imprisonment on all counts except Count 18. The court ordered that Count 18 (a prison term of 10 years for the rape of M.B.) be served consecutive to the total aggregate term, thus making McDaniel eligible for parole no earlier than 35 years after he begins serving his sentences. This appeal followed.

## II. Trial Testimony and Evidence

{¶ 6} L.B., who was 23 years old at the time of trial, testified that her mother and biological father divorced when she was in the fourth grade. She said that she, her mother D.M., her sister M.B., and her brother M. moved to an apartment in Richmond Heights, and McDaniel began living with them when she was in the sixth grade. She said that her mother worked a full-time job from 7 a.m. to 3 p.m. and a part-time job from 5 p.m. to 9 p.m., and that McDaniel, who was unemployed, stayed at home to care for her and her siblings.

{¶ 7} L.B. testified that the first incident of abuse happened when she was 12 years old. She said that she and McDaniel were sitting on the couch in the living room when he put his hand inside her jeans, touched her genitals, and penetrated her vagina with his fingers. L.B. said that similar incidents began happening "pretty much any chance he got," but she did not tell anyone because she was scared. She

testified that McDaniel told her "he felt a special connection" to her and "that it was something we should keep between ourselves."

{¶ 8} L.B. testified that the family moved to a house in Cleveland Heights the summer before she began seventh grade, and that McDaniel continued to penetrate her vagina with his fingers "almost every day." She said the incidents occurred mostly in McDaniel's bedroom and sometimes in her room, and that M.B. and M. would be in their rooms or watching TV when the incidents occurred.

{¶ 9} L.B. testified that when she was 13 years old, the family moved to a three-bedroom apartment in Mayfield Heights. L.B. said that her mother was still working two jobs, and McDaniel was still unemployed, and the abuse escalated to vaginal intercourse and oral sex. L.B. testified that the first time McDaniel performed oral sex on her, she was in his bedroom and McDaniel removed her clothes and pushed her on the bed. L.B. said that she told McDaniel she did not want him to perform oral sex on her but he "was resistant in a way, to a point where it was like I can't move." She said she gave in because she did not know if McDaniel would hurt her if she resisted further. L.B. said that after the first incident of oral sex, McDaniel began performing oral sex on her "almost every day." She said that McDaniel also forced her to perform oral sex on him.

{¶ 10} L.B. testified that McDaniel told her that he was using the sexual activity with her to "groom" her to be a "better sexual partner to boys" because boys would not "like a girl who's a prude or doesn't have experience." She said she was 14 years old the first time McDaniel had vaginal intercourse with her, and after that

incident, McDaniel continued to sexually assault her vaginally "almost every day." She did not tell anyone about the abuse, however, because McDaniel told her that it would "ruin" their family if she told anyone, and her mother "would be very upset."

{¶ 11} L.B. said that the last sexual abuse occurred when she was 16 years old. She said she "got fed up," told McDaniel she was "not doing this anymore," and ran out of the bedroom and locked herself in a bathroom. She said that McDaniel did not approach her again until she was 18 years old, when she again rebuffed him.

{¶ 12} L.B. testified that she suspected that McDaniel was also abusing M.B. She said that she and M.B. shared a bedroom, with L.B. in the top bunk. She said that McDaniel would tell their mother he was going to tell her and M.B. a bedtime story, and would then come in their room and sexually assault them while he was talking. L.B. and M.B. never spoke with each other about the incidents, however.

{¶ 13} L.B. testified that she moved out of the house when she was 18 years old, and began mental health counseling in 2016 because she was feeling suicidal. She said she did not tell anyone other than her therapist about the abuse until 2018, when she finally decided to confront McDaniel after a particularly upsetting therapy session. She said she texted McDaniel, who refused to acknowledge responsibility. L.B. said that several days later, she told her mother, D.M., and M.B. what McDaniel had done, and within two weeks of that conversation, she reported the abuse to law enforcement.

{¶ 14} M.B., who was 22 years old at the time of trial, testified that McDaniel also sexually abused her when she was a child. She recalled that the abuse started

after the family moved to Richmond Heights, when she was in the second grade. She said that McDaniel would inappropriately touch her buttocks and lower back while he hugged her. She said she asked him to stop and tried to get away but could not.

{¶ 15} M.B. did not recall any specific instances of abuse while the family lived in Cleveland Heights. She said the family moved to an apartment in Mayfield Heights when she was eleven years old and in the sixth grade. She recalled an incident in that apartment where McDaniel called her into the living room and told her it was time that she learn "about touch and courage and how to have passion when you start getting with boys." She said that one or two days later, McDaniel called her into his bedroom, lay next to her on the bed, and touched her genitals over her clothes. M.B. said the touching escalated to touching her under her clothes, and then progressed to McDaniel performing oral sex on her and forcing her to perform oral sex on him. M.B. said McDaniel would also penetrate her vagina with his fingers, and twice attempted to perform vaginal intercourse with her. M.B. testified that the abuse occurred "almost every day after school" when her mother was not home. She said that she told McDaniel multiple times to stop and tried to resist, but he would "keep going."

{¶ 16} M.B. testified that the family moved to a house in Mayfield Heights when she was 16 or 17, where the abuse continued but not as frequently as before. After graduating from high school, M.B. left home to attend Kent State University. She said she started therapy while attending Kent State and finally told her therapist

about the abuse after she was diagnosed with depression and PTSD. She said she never told anyone about the abuse while it was happening because McDaniel told her their family would "fall apart" if she told anyone and her mother would be very hurt.

{¶ 17} M.B. testified that she had a "vague idea" that McDaniel was also abusing L.B., but she and L.B. never talked about it. She said she once walked by the dining room and saw L.B. sitting on McDaniel's lap, straddling him, as they held each other. She recalled another incident where she woke up to McDaniel standing in her and L.B.'s bedroom; McDaniel's hands "were up in L.B.'s bed" and M.B. heard "small tiny noises." She testified that when she jumped out of her bed, McDaniel hurriedly pulled his hands back, told M.B. he did not know that she was awake, and left the room. M.B. testified that the first time she and L.B. talked about the abuse was when they met with their mother several days after L.B. confronted McDaniel by text.

{¶ 18} Both L.B. and M.B. testified that they considered McDaniel, who married their mother in 2010, to be their stepfather while they were growing up. They also both testified that they no longer have any relationship whatsoever with their mother because she refused to believe their allegations about McDaniel.

{¶ 19} G.J., McDaniel's 25-year-old biological daughter, testified that she spoke with McDaniel in March 2018 about L.B. and M.B.'s allegations. She said that McDaniel told her "there were temptations." G.J. testified that when she started crying during the conversation, McDaniel told her, "I'm sorry."

{¶ 20} A.R. — L.B., M.B., and M.'s stepsister — testified that she texted her mother, D.M., after learning about the abuse allegations, and McDaniel texted her back. A.R. testified that state's exhibit Number 2 was an accurate photograph of the screen shot of the text from McDaniel. The text stated:

> [A.] please help to stop this, don't be a part of this in the wrong way. Your mother could have a stroke or a heart attack from all of this. She has been told the truth and we just want to let this family heal and stop all of this hate. I am very very truly sorry! My wife and I love each other so much and she has forgiven me. But we hurt I hurt and suffer badly! We have church counseling, we have professional counseling, please help us stop all of this please, please, please [A.] I beg of you please! If you ever loved your mother and I, or if you ever loved your mother please stand by what she wants to see happen. She needs you to help[] I need you to help! I am so sorry OMG! I am sorry! I love this family, we pray every day.

> Love, Mac

{¶ 21} A.R. testified that she knew the text came from McDaniel because she recognized his cell phone number and "Mac" was his nickname. She said that despite McDaniel's text, she went to the police station with L.B. to support her when she reported the abuse allegations to law enforcement.

{¶ 22} During her testimony, D.M. identified her and McDaniel's voices on several jail recordings of telephone calls between her and McDaniel. D.M. agreed that in one call (state's exhibit No. 4), McDaniel told her to "tell them I'm sorry." In another call (state's exhibit No. 6), McDaniel told D.M., "God bless L.B. and M.B. and M. and everybody so they can have mercy in their heart for me and forgive me."

### III. Law and Analysis

#### A. Sufficiency and Manifest Weight of the Evidence

{¶ 23} In his first assignment of error, McDaniel contends that the trial court erred in denying his Crim.R. 29(A) motion for acquittal because there is insufficient evidence to support his convictions. In his second assignment of error, he contends that his convictions are against the manifest weight of the evidence.

{¶ 24} The test for sufficiency requires a determination of whether the prosecution met its burden of production at trial. *State v. Bowden*, 8th Dist. Cuyahoga No. 92266, 209-Ohio-3598, ¶ 12. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997).

{¶ 25} A manifest weight challenge, on the other hand, questions whether the state met its burden of persuasion. *State v. Hill*, 8th Dist. Cuyahoga No. 98366, 2013-Ohio-578, ¶ 32. To determine whether a conviction is against the manifest weight of the evidence, the reviewing court must look at the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *Thompkins* at 388.

{¶ 26} McDaniel was convicted of rape in violation of R.C. 2907.02(A)(1)(b), which provides that "[n]o person shall engage in sexual conduct with another who is not the spouse of the offender when the other person is less than thirteen years of age," and R.C. 2907.02(A)(2), which provides that "[n]o person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force."[1]

{¶ 27} He was also convicted of sexual battery in violation of R.C. 2907.03(A)(5), which provides that "[n]o person shall engage in sexual conduct with another, not the spouse of the offender, when the offender is the other person's * * * stepparent."

{¶ 28} McDaniel was also convicted of gross sexual imposition in violation of R.C. 2907.05(A)(1) and (4), which provide that "[n]o person shall have sexual contact with another, not the spouse of the offender; cause another, not the spouse of the offender, to have sexual contact with the offender * * * when (1) the offender purposely compels the other person * * * to submit by force or threat of force or (4) the other person * * * is less than thirteen years of age * * *."[2]

---

[1] "Sexual conduct" contemplates vaginal or anal intercourse, oral sex, or without privilege to do so, the insertion of any part of the body or other object into the vaginal or anal opening of another. *See* R.C. 2907.01(A).

[2] "Sexual contact" means "any touching of an erogenous zone of another, including without limitation, the thigh, genitals, buttock, [or] pubic region * * * for the purpose of sexually arousing or gratifying either person." R.C. 2907.01(B).

{¶ 29} He was also convicted of kidnapping in violation of R.C. 2905.01(A)(4), which provides that "[n]o person, by force, threat, or deception, or in the case of a victim under the age of thirteen, shall remove another from the place where the other person is found or restrain the liberty of the other person, to engage in sexual activity with the victim against the victim's will."[3]

{¶ 30} McDaniel contends that his convictions for rape, sexual battery, and gross sexual imposition were against the manifest weight of the evidence and not supported by sufficient evidence because "there simply is not the requisite evidence that [he] committed these sexual acts" and "there is no physical evidence of this happening." With respect to the kidnapping convictions, McDaniel contends that there is no evidence that he removed L.B. and M.B. from where they were or restrained their liberty.

{¶ 31} Viewing the evidence in a light most favorable to the prosecution, we find L.B. and M.B.'s testimony sufficient to establish the elements of rape, sexual battery, gross sexual imposition, and kidnapping. L.B. testified that McDaniel had forced vaginal intercourse with her, and both women testified that McDaniel penetrated them vaginally with his fingers, performed oral sex on them, and forced them to perform oral sex on him, all over their objection. L.B. and M.B.'s testimony was sufficient to fall within the ambit of sexual conduct and sexual contact contemplated by R.C. 2907.01(A) and (B), and was sufficient to establish that

---

[3] "Sexual activity" means sexual conduct, sexual contact, or both. R.C. 2907.01(C).

McDaniel purposely compelled them by force or threat of force to engage in such conduct, in some instances while they were less than 13 years old.

{¶ 32} Furthermore, despite McDaniel's argument that there is no physical evidence to support his convictions, "Ohio courts have consistently held that a victim's testimony, if believed, is sufficient to support a rape conviction. There is no requirement that a rape victim's testimony be corroborated as a condition precedent to conviction." *State v. Patterson*, 8th Dist. Cuyahoga No. 104266, 2017-Ohio-1444, ¶ 23, citing *State v. Williams*, 8th Dist. Cuyahoga No. 92714, 2010-Ohio-70, ¶ 32.

{¶ 33} With respect to McDaniel's argument that there was no evidence that he ever restrained L.B. or M.B.'s liberty sufficient to sustain his convictions for kidnapping, L.B. testified that she gave in to McDaniel's demand for oral sex after McDaniel pushed her down on the bed such that she could not move and was worried he might hurt her if she resisted further. M.B. testified that she tried to resist McDaniel during the many incidents of abuse but he would "keep going."

{¶ 34} Further, this court has specifically held in relation to kidnapping that "a child's liberty may be restrained through the inherent social/psychological pressures that accompany" an adult-child familial relationship." *State v. Zimmer*, 8th Dist. Cuyahoga No. 104946, 2017-Ohio-4440, ¶ 15. Both L.B. and M.B. testified that they considered McDaniel to be their stepfather and that he told them to keep the abuse secret because it would ruin their family and upset their mother if they told anyone. Accordingly, the evidence demonstrates that McDaniel restrained L.B. and M.B.'s liberty by psychological pressure inherent in his position as their

stepfather. Furthermore, this court has found that the elements of rape and kidnapping have "'such a singularity of purpose and conduct that kidnapping may be said to be implicit within every forcible rape.'" *Williams* at ¶ 33, quoting *State v. Mitchell*, 6 Ohio St.3d 416, 418, 453 N.E.2d 593 (1983).

{¶ 35} Accordingly, we find that McDaniel's convictions are supported by sufficient evidence. We also find that they are not against the manifest weight of the evidence. Although we review credibility when considering the manifest weight of the evidence, we are cognizant that the weight to be given the evidence and the credibility of the witnesses are primarily matters for the trier of fact to decide. *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967). The trier of fact has the authority to "believe or disbelieve any witness or accept part of what a witness says and reject the rest." *State v. Antill*, 176 Ohio St.61, 67, 197 N.E.2d 548 (1964). Thus, an appellate court will overturn a criminal conviction due to the manifest weight of the evidence only in extraordinary circumstances where the evidence presented at trial weighs heavily against the conviction. *Thompkins* at 388.

{¶ 36} This is not that exceptional case. Indeed, despite defense counsel's argument to the jury that the events described by L.B. and M.B. simply "didn't happen" and that McDaniel "didn't do it," McDaniel's own words established that he sexually abused his stepdaughters. In his text to A.R., sent to D.M. after A.R. learned of the abuse allegations, McDaniel advised A.R. that he had told D.M. "the truth" and that he was "very very truly sorry" for what had happened. In his conversation with G.J. about the abuse allegations, McDaniel admitted "there were

temptations" and told her he was sorry for what had happened. In his telephone conversations with D.M. while he was in jail, McDaniel instructed D.M. to tell L.B., M.B., and M. that he was "sorry" and further, asked God to "bless L.B., M.B., and M. and everybody so they can have mercy in their heart for me and forgive me." The only reasonable conclusion from McDaniel's admissions that he was sorry and his pleas for mercy and forgiveness from his victims is that he did indeed commit the crimes he was accused of.

{¶ 37} We are not persuaded by McDaniel's argument that "it defies common sense" to believe that the abuse happened because L.B. and M.B. never told anyone about the abuse, even though it continued for years. Theresa Kaufmann, a crisis intervention specialist at mental health agency Frontline Services, testified that she met with L.B. after she called Frontline's crisis hotline. She said that L.B. reported being sexually abused by McDaniel from the ages of 12 to 16. Kaufmann testified further that it is "quite common" for sexual abuse victims, especially child sexual abuse victims, to not report the abuse because the abusers manipulate them and "tell all kind of things" so they will not disclose. Kaufmann testified that she has had 60-year-old clients who report sexual abuse for the first time to her. Thus, L.B. and M.B.'s failure to report the abuse until they were adults does not demonstrate that the abuse did not happen.

{¶ 38} The jury did not lose its way in convicting McDaniel of rape, sexual battery, gross sexual imposition, and kidnapping, nor is this the exceptional case

where the evidence weighs heavily against the convictions. The first and second assignments of error are overruled.

## B. Inquiry by the Court Regarding McDaniel's Right to Testify

{¶ 39} In his third assignment of error, McDaniel asserts that he was denied his due process rights because the trial court did not inform him of his right to testify in his defense and inquire of him whether he wished to exercise that right. McDaniel's argument is without merit.

{¶ 40} "A trial judge is not required to conduct an inquiry with the defendant about the decision whether to testify." *State v. Bey*, 85 Ohio St.3d 487, 497, 709 N.E.2d 484 (1999); *State v. Fry*, 125 Ohio St.3d 163, 2010-Ohio-1017, 926 N.E.2d 1239. Accordingly, having determined there is no duty to make such an inquiry, the trial court's failure to advise McDaniel of his right to testify cannot be error. The third assignment of error is overruled.

## C. Ineffective Assistance of Counsel

{¶ 41} At sentencing, McDaniel advised the judge that the court had not "hear[d] the truth" because he "never got a chance to take the stand," and that defense counsel did not present photographs and videos at trial that would have allegedly proved his innocence. Citing these statements, in his fourth assignment of error, McDaniel contends that his counsel was ineffective because his counsel failed to "affirmatively assert on the record" that McDaniel did not wish to testify, and failed to "affirmatively mount a defense."

{¶ 42} To establish ineffective assistance of counsel, a defendant must demonstrate that counsel's performance fell below an objective standard of reasonable representation and that he was prejudiced by that performance. *State v. Drummond*, 111 Ohio St.3d 14, 2006-Ohio-5084, 854 N.E.2d 1038, ¶ 205, citing *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Prejudice is established when the defendant demonstrates "a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland* at 694. In evaluating a claim of ineffective assistance of counsel, a court must be mindful that there are countless ways for an attorney to provide effective assistance in a given case and it must give great deference to counsel's performance. *Id.* at 689.

{¶ 43} We find no ineffective assistance of counsel. First, defense counsel was not ineffective for not affirmatively stating on the record that McDaniel did not want to testify. Other than McDaniel's self-serving statement at sentencing that the court had not heard the truth because he did not take the stand, there is nothing in the record indicating that McDaniel wanted to testify. When defense counsel informed the court that the defense had no witnesses to present, McDaniel made no objection whatsoever to counsel's statement. Thus, we cannot conclude that counsel was ineffective for not affirmatively stating to the court that McDaniel had waived his right to testify.

{¶ 44} Furthermore, despite McDaniel's contention otherwise, the record reflects that his counsel "affirmatively mounted a defense." Counsel gave opening and closing arguments that asserted McDaniel's innocence, and he vigorously cross-examined the state's witnesses during trial. Although McDaniel asserted at sentencing that defense counsel failed to present photographs and videos that would have allegedly proven his innocence, the record reflects that no photographs or videos were ever produced by McDaniel during discovery and, therefore, they would not have been admissible at trial. Accordingly, counsel's performance did not fall below an objective standard of reasonable representation.

{¶ 45} Furthermore, McDaniel fails to demonstrate that he was prejudiced by counsel's allegedly defective performance and that but for counsel's defective performance, the result of the trial would have been otherwise. This is undoubtedly because the evidence against him, which included statements he made to his wife in which he apparently admitted his guilt, was overwhelming. McDaniel's counsel was not ineffective, and the fourth assignment of error is overruled.

### D. Consecutive Sentences

{¶ 46} McDaniel's fifth assignment of error asserts that the trial court did not make the requisite statutory findings to impose consecutive sentences.

{¶ 47} Consecutive sentences may be imposed only if the trial court makes the required findings pursuant to R.C. 2929.14(C)(4). *State v. Bonnell*, 140 Ohio St.3d 209, 2014-Ohio-3177, 16 N.E.3d 659, ¶ 20-22. The court must both make the

statutory findings under R.C. 2929.14(C)(4) at the sentencing hearing and incorporate those findings into its sentencing entry.  *Id.* at the syllabus.

{¶ 48} Despite raising the trial court's failure to make the requisite statutory findings as an assignment of error, McDaniel concedes in his appellate brief that the trial court both made the required findings for the imposition of consecutive sentences at the sentencing hearing and incorporated those findings into its journal entry of sentencing.  Our review of the record demonstrates likewise.  Accordingly, the fifth assignment of error is overruled.

{¶ 49} Affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.  The defendant's convictions having been affirmed, any bail pending appeal is terminated.  Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27

of the Rules of Appellate Procedure.

_____
KATHLEEN ANN KEOUGH, JUDGE

ANITA LASTER MAYS, P.J., and
FRANK D. CELEBREZZE, JR., J., CONCUR