[Cite as *State v. Hill*, 2021-Ohio-3028.]

# COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

STATE OF OHIO, :

    Plaintiff-Appellee, :

                            No. 109727

    v. :

RAYVON HILL, :

    Defendant-Appellant. :

---

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** September 2, 2021

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-19-640674-C

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Kristin M. Karkutt, Assistant Prosecuting Attorney, *for appellee.*

The Law Office of Donald Gallick L.L.C., and Donald M. Gallick, *for appellant.*

FRANK D. CELEBREZZE, JR., P.J.:

{¶ 1} Appellant Rayvon Hill ("appellant") appeals his convictions by the Cuyahoga County Court of Common Pleas for murder, felonious assault, and involuntary manslaughter, arguing that they were not supported by sufficient

evidence and were against the manifest weight of the evidence. After a thorough review of the law and facts, we affirm the judgment of the trial court.

## I. Factual and Procedural History

**{¶ 2}** Appellant, along with his codefendants James Harrison ("Harrison") and Antonio Tyler ("Tyler"), were accused of shooting and killing Mattayo Heard ("Heard") in the lot of an apartment complex located in Cleveland, Ohio. The shooting occurred as the result of a fight that had broken out among a large number of people. The evidence adduced at trial showed the following people were present:

* Charmayne Gainer, a resident of the apartment complex and sister of appellant;

* Appellant, who was visiting Charmayne, at the apartment complex;

* Chauntrice Hill ("Chauntrice"), sister of appellant, who was also visiting Charmayne;

* Camille Gainer, sister of appellant, who also came to see Charmayne;

* Shadava Kizer ("Shadava"), who, along with her children S. and D.B., were visiting Shadava's sister, Shalanda, who resided at the apartment complex;

* Harrison and Heard, friends of Shadava, who were in Harrison's vehicle;

* Dalilia Wright, who along with her daughter, A.Y., went to the apartment complex to visit Shadava; and

* Tiffany Jones, a friend of Shadava's, who was at the apartment complex just to "hang out."

**{¶ 3}** On the day in question, Charmayne had arrived home from work to observe Shadava's vehicle in the parking lot. Charmayne testified that her daughter

had previously been bullied by Shadava's daughter and niece. She had complained to the leasing office of the apartment complex, and Shadava had been banned from the premises.

{¶ 4} Charmayne took pictures of the vehicle and informed the leasing office. Charmayne was able to overhear Shadava and her friends yelling about "busting out [Charmayne's] windows." She called her sister Camille to inform her of what was happening. Chauntrice was present with Camille and said that they were on their way. Shortly thereafter, Camille and Chauntrice arrived, along with appellant and several of Chauntrice's friends. Subsequently, appellant's friend Tyler and another friend known as "Nephew" also arrived at the apartment complex.

{¶ 5} They all gathered inside Charmayne's apartment and then decided to go outside. A fight broke out between the people who gathered with Charmayne and Shadava and her friends. Charmayne testified that she observed a man hit Chauntrice and that appellant had seen this as well, which caused appellant to jump into the fight. Charmayne further stated that she saw a man in pink pants, who was in a silver vehicle, begin shooting, which caused her, appellant, and several others to retreat into the apartment building. While in the building, Charmayne retrieved her firearm, a 9 mm Ruger, and went back outside. She then fired one shot toward Shadava. Photographs and video footage from the scene depicted appellant walking toward the silver vehicle, along with Chauntrice and Nephew, with a firearm in appellant's hand. Charmayne did not see appellant fire the weapon that day but testified that he told her the next day that he had also fired his weapon.

{¶ 6} The crowd dispersed and police arrived. Charmayne did not tell the officers that she had shot her weapon.

{¶ 7} Charmayne then hired an attorney for herself and appellant. She arranged for the two of them, along with Chauntrice, to meet with the attorney; however, appellant did not attend. A second meeting was held where appellant did attend. Chauntrice secretly made a recording of this meeting, which was played at trial. Charmayne testified that after the meeting, she learned that appellant and Chauntrice were attempting to blame her for Heard's murder. She then met with homicide detectives and turned over her firearm, along with two magazines, her case, and ammunition. The police were able to see that one bullet and casing were missing from her container of ammunition.

{¶ 8} Harrison testified that on the day in question, he and Heard had visited a liquor store and then drove to meet Shadava at the apartment complex. He and Heard were in his vehicle, a silver Chrysler Sebring, smoking a blunt of marijuana and drinking alcohol when they heard yelling by Shadava's vehicle. He then observed several people coming out to the parking lot from the apartment complex. Harrison stated that he was aware of a feud involving Shadava.

{¶ 9} Harrison exited the vehicle with his firearm in hand; Heard remained inside the vehicle. He identified himself in the video as shooting three warning shots into the air. He then returned to his vehicle, when Heard yelled at him to drive away and Harrison heard a gunshot. The video depicted an individual wearing a gray hat walking toward Harrison's car with a firearm, a .380-caliber handgun, in his hand.

Heard fell into Harrison's lap, who then drove to Euclid Hospital for help. Harrison spoke to officers at the hospital and was arrested for his involvement with the incident.

{¶ 10} Harrison admitted to detectives that he fired his weapon during the altercation. He was subsequently charged with two counts of felonious assault with one- and three-year firearm specifications, one count of aggravated riot with one- and three-year firearm specifications, and one count of improperly handling a firearm in a motor vehicle. Prior to his testimony, Harrison accepted a plea to one count of attempted felonious assault with firearm specifications, aggravated riot, and improperly handling a firearm in a motor vehicle.

{¶ 11} Cleveland Police Sgt. Aaron Reese was assigned to investigate Heard's death. Sgt. Reese responded to the scene and spoke with building management who provided him with several photographs of the parking lot that they had received from Charmayne on the day of the shooting. Sgt. Reese also obtained and reviewed two cell phone videos that captured the events in question. Sgt. Reese further explained that after reviewing the video evidence and DNA reports, he was able to identify appellant as the individual who was wearing the gray hat that had been recovered in the parking lot. After identifying appellant as a suspect, Sgt. Reese interviewed appellant at the homicide unit. This interview had been recorded and was played for the jury. Sgt. Reese testified that during his two-hour interview with appellant, appellant had told him approximately 20 times that he had only fired one

shot during the altercation. Sgt. Reese testified that at the end of the interview, appellant had changed his story and admitted that he had fired a second shot.

{¶ 12} Edward Lattyak ("Lattyak"), the firearms and tool mark section supervisor for the Cuyahoga County Medical Examiner's Crime Laboratory, also testified on behalf of the state. Lattyak testified that, in connection with this investigation, he received for testing a total of six spent or discharged shell casings, three of which were 9 mm caliber and the other three were .380-caliber. Lattyak also received two firearms for examination and comparison: one .380-caliber firearm and one 9 mm Ruger. Based upon his examination, Lattyak concluded that the three .380-caliber spent shell casings were fired from the .380-caliber firearm that was submitted under this investigation. Lattyak testified that when he examined the three 9 mm casings, he observed that each one of them was from a different brand — CBC, Frontier, and RP. Lattyak testified that he compared the three spent 9 mm casings recovered from the scene to the submitted 9 mm Ruger and concluded that only one, the 9 mm CBC brand casing, was fired from that firearm. Lattyak further determined that the other two spent 9 mm casings were not discharged by either of the two submitted firearms, but they were discharged from the same unrecovered firearm.

{¶ 13} Cleveland Police Officer Dan McCandless testified that he had arrived on the scene at the apartment complex and observed shell casings in the parking lot. Officer McCandless was then dispatched to Euclid Hospital for an individual with gunshot wounds. When he arrived at the hospital, he observed several Euclid police

officers standing around a silver vehicle located by the main entrance of the hospital ER.  A black male was sitting on the curb by the vehicle.  Officer McCandless spoke with this individual, who was identified as Harrison.  As he spoke with Harrison, he learned that he and the nearby vehicle had been involved in the incident at the apartment complex at 16151 Lakeshore Boulevard.

{¶ 14} Appellant was indicted on six counts, consisting of charges for murder, felonious assault, involuntary manslaughter, aggravated riot, and having weapons while under disability, along with accompanying firearm specifications.  Appellant was convicted by a jury of murder (two counts), felonious assault, involuntary manslaughter, and aggravated riot.  Appellant had waived his right to a jury on the charge of having weapons while under disability, and the court found him guilty on that count.

{¶ 15} Appellant filed the instant appeal, raising four assignments of error for our review:

> 1.  The trial court erred by denying the Crim.R. 29 motion because the murder and felonious assault convictions were not supported by sufficient evidence as to the element of causation and the mental state of "knowingly."
>
> 2.  The trial court erred by denying the Crim.R. 29 motion because the conviction for involuntary manslaughter was not supported by sufficient evidence as to the element of causation.
>
> 3.  The convictions for murder and felonious assault are against the manifest weight of the evidence as causation and mens rea were not proven beyond a reasonable doubt.

4. The conviction for involuntary manslaughter is against the manifest weight of the evidence because the evidence failed to prove beyond a reasonable doubt that defendant caused the death of the victim.

## II. Law and Analysis

## A. Sufficiency of the Evidence

{¶ 16} Because appellant's assignments of error are interrelated, we will address them together.

{¶ 17} Appellant first argues that his convictions for murder, felonious assault, and involuntary manslaughter were not supported by sufficient evidence with regard to the element of causation.

{¶ 18} Crim.R. 29 mandates that the trial court issue a judgment of acquittal where the prosecution's evidence is insufficient to sustain a conviction for the offense. Crim.R. 29(A) and sufficiency of the evidence require the same analysis. *State v. Taylor*, 8th Dist. Cuyahoga No. 100315, 2014-Ohio-3134. "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." *State v. Driggins*, 8th Dist. Cuyahoga No. 98073, 2012-Ohio-5287, ¶ 101, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997).

{¶ 19} The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Vickers*,

8th Dist. Cuyahoga No. 97365, 2013-Ohio-1337, citing *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991).

{¶ 20} In support of his argument regarding causation, appellant asserts that there were three shooters — Charmayne, Harrison, and himself — and that which person actually fired the round that killed Heard was not proven beyond a reasonable doubt. In addition, appellant contends that Harrison was intoxicated and testified that he shot three times "into the air"; however, another witness testified that Harrison fired four shots. Finally, appellant further argues that the forensic testimony failed to show that he fired the bullet that caused Heard's death.

{¶ 21} The state argues that appellant's argument that it is unknown who fired the fatal shot ignores the timing of the shots, as evidenced by testimony and videos of the incident. Harrison's three shots into the air occurred before he was in the vehicle with Heard. Harrison initially fired his weapon, a .380-caliber firearm, into the air to disperse the fighting crowd. He then went back to his car where Heard was sitting and started to drive away. While attempting to drive out of the parking lot, Harrison heard a gunshot, and Heard fell over into his lap.

{¶ 22} With regard to the possibility of Charmayne as Heard's shooter, Charmayne testified and admitted she fired one shot from her weapon, a 9 mm Ruger, in the direction of Shadava's vehicle. Charmayne testified that Harrison's silver Sebring was initially parked near Shadava's vehicle, but later moved further down. Charmayne's shell casing was found furthest from where Heard was shot.

{¶ 23} The state also asserts that a total of six spent shell casings and two live rounds of ammunition were found on scene during the investigation. Three of the six casings were .380-caliber and the remaining three were 9 mm caliber. Based on this evidence, the state maintains that the three warning shots fired by Harrison are accounted for. Further, Charmayne admitted to firing one of the 9 mm shots. According to testimony from the firearms and tool mark section supervisor for the Cuyahoga County Medical Examiner's Crime Laboratory, three spent 9 mm casings were recovered from the scene, but only one, the 9 mm CBC brand casing, was fired from the 9 mm Ruger recovered from Charmayne. The other two 9 mm casings, although two different brands, were determined to have been discharged from the same unrecovered firearm. These other two shell casings were found closest to the location where the victim was killed. According to Sgt. Reese's testimony, appellant stated approximately 20 times that he had only fired one shot during the altercation. However, at the end of the interview with Sgt. Reese, appellant admitted that he had fired a second shot.

{¶ 24} While appellant argues that the forensic evidence did not prove that he fired the fatal shot, we note that Ohio law does not require forensic evidence to sustain a conviction. "This court has long held that circumstantial evidence is sufficient to sustain a conviction if that evidence would convince the average mind of the defendant's guilt beyond a reasonable doubt." *State v. Heinish*, 50 Ohio St.3d 231, 238, 553 N.E.2d 1026 (1990).

{¶ 25} Viewing the evidence in a light most favorable to the state, as we must, we find that sufficient evidence existed to prove that appellant was responsible for the shot fired from the unrecovered gun in the direction of Harrison's vehicle, which struck and killed Heard. We therefore hold that the trial testimony and video footage were sufficient for a rational trier of fact to find the causation element was proven in appellant's convictions for murder, felonious assault, and involuntary manslaughter.

{¶ 26} Appellant further contends that his convictions for murder and felonious assault were not supported by sufficient evidence with regard to the mental state of "knowingly." However, we find that appellant's brief did not present any argument or authority in support of this proposition. App.R. 16(A) requires a party to separately argue each assignment of error, and under App.R. 12(A)(2), an appellate court may disregard any assignment of error, or portion thereof, if the appellant fails to make a separate argument. *Cleveland v. Taylor*, 8th Dist. Cuyahoga No. 109371, 2021-Ohio-584, ¶ 87, citing *State v. Wells*, 8th Dist. Cuyahoga No. 98388, 2013-Ohio-3722, ¶ 55.

{¶ 27} Accordingly, because appellant failed to present any argument or citations to authority with regard to the knowingly element of his murder and felonious assault convictions, these assertions shall be disregarded.

{¶ 28} Appellant's first and second assignments of error, related to sufficiency of the evidence, are overruled.

## B. Manifest Weight of the Evidence

{¶ 29} Appellant makes the same assertions regarding causation and knowingly with regard to his manifest weight of the evidence argument.

{¶ 30} In *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 25, the Supreme Court of Ohio addressed the standard of review for a criminal manifest weight challenge, as follows:

> The criminal manifest-weight-of-the-evidence standard was explained in *State v. Thompkins* (1997), 78 Ohio St.3d 380, 678 N.E.2d 541. In *Thompkins*, the court distinguished between sufficiency of the evidence and manifest weight of the evidence, finding that these concepts differ both qualitatively and quantitatively. *Id.* at 386, 678 N.E.2d 541. The court held that sufficiency of the evidence is a test of adequacy as to whether the evidence is legally sufficient to support a verdict as a matter of law, but weight of the evidence addresses the evidences effect of inducing belief. *Id.* at 386-387, 678 N.E.2d 541. In other words, a reviewing court asks whose evidence is more persuasive then the state's or the defendant's? We went on to hold that although there may be sufficient evidence to support a judgment, it could nevertheless be against the manifest weight of the evidence. *Id.* at 387, 678 N.E.2d 541. "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a 'thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony." *Id.* at 387, 678 N.E.2d 541, citing *Tibbs v. Florida* (1982), 457 U.S. 31, 42, 102 S.Ct. 2211, 72 L.Ed.2d 652.

{¶ 31} An appellate court may not merely substitute its view for that of the jury, but must find that "in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Thompkins* at 387. Accordingly, reversal on manifest weight grounds is reserved for "the exceptional case in which the evidence weighs heavily against the conviction." *Id.*

{¶ 32} We find that, after reviewing the record and for the reasons set forth above, the jury did not lose its way and create a manifest miscarriage of justice. Appellant's third and fourth assignments of error, related to manifest weight of the evidence, are overruled.

### III. Conclusion

{¶ 33} Appellant's convictions were supported by sufficient evidence and were not against the manifest weight of the evidence. All of appellant's assignments of error are overruled, and the judgment of the trial court is affirmed.

{¶ 34} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's convictions having been affirmed, any bail pending is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
FRANK D. CELEBREZZE, JR., PRESIDING JUDGE

EILEEN T. GALLAGHER, J., and
EMANUELLA D. GROVES, J., CONCUR